115 S.W.3d 804 (2003)
In the Interest of R.F. and L.C.
No. 05-02-01677-CV.
Court of Appeals of Texas, Dallas.
September 29, 2003.
*806 Jessica R. Dixon, Dallas, for appellant.
Lori L. Ordiway, Assistant District Attorney for Dallas County, Chief of the Appellate Division, Todd Lindsey Bush, Cheryl D. Holder, Assistant District Attorneys, Dallas, for appellee.
Before Justices MOSELEY, RICHTER, and FRANCIS.

OPINION
Opinion By Justice FRANCIS.
The Texas Department of Protective and Regulatory Services petitioned to terminate the parental rights of Crystal Fleming to her two sons, R.F. and L.C. The jury found Fleming had endangered her children and termination of her parental rights was in their best interests. In three issues, she challenges the factual sufficiency of the evidence to support those findings. We affirm.
Fleming was seventeen years old when she gave birth to R.F. Eleven months later, L.C. was born. The Department removed both children from Fleming's care at birth and filed petitions to terminate her rights. At trial, the Department relied heavily on Fleming's own eight-year history as a child in the Department's care to show a continuing course of conduct that endangered her children.
Fleming had been in the Department's care since age ten, having been physically abused by her father and sexually abused by her mother's boyfriend. From the beginning, her relationship with the Department was shaky. Fleming ran away from her first foster home and, over the next eight years, was repeatedly transferred from placement to placement because of disruptive and violent behavior. Evidence showed Fleming repeatedly (1) ran away from placements, (2) assaulted or threatened to assault staff and peers, (3) attempted suicide, and (4) was detained in juvenile facilities for criminal offenses. She had been diagnosed as bipolar, ADHD, and as "oppositional defiant."
In June 2000, the Department placed her in a therapeutic group home, Our Friends Place. Within two months, she ran away. During this time Fleming became pregnant with her first child. When the Department found her seven days later, she was admitted to a psychiatric hospital, where she told doctors she used marijuana. One day after her return to Our Friends Place, Fleming assaulted a staff member and attempted suicide by cutting her wrist with a razor.
The Department next placed Fleming in a higher-care residential treatment facility. One month later, the facility asked that she be removed after she tested positive for marijuana and because it learned she was pregnant. Because of the pregnancy, placement options were limited, but the Department was able to locate a substance *807 abuse treatment center where Fleming and her baby, once born, could stay at least until she reached majority and perhaps longer. The facility was structured and had a staff that could supervise Fleming with her child. The Department explained to Fleming that the placement was a "last shot" for her. Fleming did not believe she had a drug problem and despite the earlier warning, refused to comply with the program. Within just a few days, Fleming threatened to cut her wrist with a nail file and attempted to run away. She was again hospitalized and told doctors she had been using "wack," marijuana, and codeine, but said she stopped using drugs when she found out she was pregnant.
After her release, Fleming lived briefly with her older sister and then moved in with two men, one her boyfriend at the time. During her pregnancy, she sought no prenatal care although the Department instructed her about Medicaid and the availability of such care. In April 2001, R.F. was born prematurely. The Department learned of R.F.'s birth when it received a physical abuse referral that reflected Fleming tested positive for marijuana at the time of his birth. R.F. did not test positive for drugs. The Department, believing R.F. was at risk because of Fleming's continuing course of self-destructive conduct and her unpreparedness to mother a child, removed R.F. and placed him in foster care.
The Department's initial goal was to reunite mother and child, and services were offered to Fleming to realize that goal. The Department set up a service plan for Fleming in May 2001, including (1) weekly visitation with R.F., (2) obtaining her GED and job training to support herself, (3) obtaining a psychological evaluation and completing any recommendations, (4) undergoing counseling to deal with her unresolved family issues, (5) participating in parenting classes, and (6) participating in a drug assessment and following all recommendations of the assessment. More than one year later, Fleming had not completed the services, or even started some, other than to consistently visit R.F., leading the Department to believe she was not motivated to have her son returned to her.
Within a few months of R.F.'s birth, Fleming became pregnant with L.C. During this pregnancy, she was beaten up by "two crackheads" while living in a motel and then she lived with a man, Leroy Cook, who physically abused her. In March 2002, eleven months after R.F. was born, Fleming gave birth to L.C. Because of the domestic violence in the home, Fleming's past drug history and untreated self-destructive behavior, the Department removed L.C.
Just weeks before the September 2002 trial, Fleming completed parenting classes, obtained a job and housing, and underwent a psychological evaluation. Dr. Nichelle Wiggings performed the psychological evaluation. During her interview, Fleming told her she started using drugs at age eleven and had attempted suicide five times. Tests revealed Fleming's intelligence as borderline and academic functioning average. With respect to emotional functioning, Wiggings said Fleming had feelings of insecurity and inferiority, had serious deficits in social skills, was psychologically immature, but acknowledged recognized Fleming was only eighteen years old. Wiggings described Fleming as "confused, very upset" over the situation with the Department, and said Fleming had demonstrated poor coping skills, poor decision making, and immaturity in her relationships. She tended to use denial a "great deal" and tended to "rationalize her decision making."
*808 Wiggings "highly recommended" that Fleming undergo individual counseling to address her past history of physical and sexual abuse, poor coping skills, poor decision-making, and self-esteem issues. She believed that Fleming's self-destructive past was a good indication of how she would react in the future if the child abuse issues were not resolved.
The Department contracted with psychotherapist Grace Montani to provide counseling services to Fleming. Montani said Fleming initially had several goals during counseling, one of the most important being to deal with childhood abuse issues. Fleming and Montani were to meet weekly, and Montani believed it would take at least a year to make any realistic headway. After her fifth counseling session, Fleming canceled future appointments and left Montani a note saying she was doing well and being responsible. Later that same day, the police were called to a domestic dispute between Fleming and her boyfriend.
Montani testified that child abuse issues were at the core of Fleming's self-destructive behavior and said it was "not probable" she could resolve those issues on her own. Montani believed Fleming would have difficulty caring for herself, much less two small children, and said her past history of abuse was relevant to her ability to parent her children. According to Montani, Fleming had not had her needs met for many years, which in turn, would make it "very, very difficult" for her to meet the needs of a child. She characterized Fleming's problems as "severe." Montani did not believe that Fleming could overcome these issues and parent her children at the same time, even if she were provided services to help her. Montani explained that Fleming needed to address her own issues before she could "be there" for her children.
Finally, Fleming underwent the drug assessment, which recommended she participate in outpatient drug counseling and random drug testing. Fleming submitted to only one drug test, which showed a positive result for marijuana and codeine. The test was taken one month after L.C.'s birth. Fleming did not believe she had a drug problem and refused to attend drug counseling.
In her defense, Fleming pointed out shortcomings in the Department's care of her as a child and essentially blamed the Department for the problems she experienced. She denied smoking marijuana before R.F.'s birth and, to explain the positive drug test at his birth, said she rode in a car with people who were smoking marijuana. She continued to deny any drug problem at trial and testified she had used drugs only once since R.F.'s birth, which coincidentally happened to be the time she tested positive one month after L.C.'s birth. Fleming acknowledged that she smoked marijuana on that occasion knowing that drug use was a reason her children were in foster care. She denied ever using "wack" or even knowing what "wack" was and denied using codeine.
Fleming agreed that someone who attempted suicide needed professional help, although she herself had refused counseling. As an explanation, she testified she was older now (nineteen) and knew how to handle the stress. Fleming also testified she had resolved her child abuse issues by forgetting them and believed therapy was a waste of time. She said she had not attempted suicide or been arrested since R.F.'s birth.
Fleming admitted that her longtime boyfriend, Cook, physically abused her while she was pregnant. In October 2001, Cook hit her knowing she was pregnant. She called the police, left Cook for three months, and then went back. Two months *809 after L.C. was born, Cook hit her again, and as before, she called the police, left Cook, but went back. These two incidents were the only times she contacted the police, but she said there was other instances of abuse. She apparently ended the relationship with Cook because at trial she had a new boyfriend, who she admitted had several drug arrests and had been in jail as late as January 2002.
With respect to the service plan, Fleming believed the most important goals, to complete parenting classes and get a job, were accomplished. By trial day, Fleming had been working at Wal-Mart for three weeks and obtained housing a month earlier. Her home was ready for the return of her children and she had a babysitter ready to care for the children while she worked. Fleming said she wanted her children returned to her because she "wants to break the cycle." She also attributed at least part of the delay in completing portions of her service plan to illness. Fleming, who has a blood disorder, was hospitalized on two occasions for several weeks.
Three other witnesses testified for Fleming. Mamie Medford, her boyfriend's aunt, testified she was prepared to babysit R.F. and L.C. while Fleming worked. Medford was a foster parent and had fifteen years' experience caring for children. Cleo Forward was Fleming's overnight supervisor at Wal-Mart. He told the jury Fleming passed a drug test before she was employed. Forward said Fleming was doing a "great job," was a "quick learner," and was "friendly with the customers and staff." He also believed Wal-Mart would accommodate Fleming, if she needed to change her hours from the night shift.
Finally, Maria Anderson testified she had been acting as a mentor to Fleming for about two weeks. Anderson told jurors that at the age of nineteen, she was pregnant, with no job and no husband, and, like Fleming, had suffered sexual abuse as a teenager. When she was seven months pregnant, Anderson tried to commit suicide. Anderson took advantage of opportunities and was now a sales manager for IBM, married for fourteen years with three children. Anderson said other people invested in her and she overcame her circumstances. She hoped to help Fleming do the same.
After hearing the evidence, the jury made findings that resulted in the termination of Fleming's parental rights to her sons. The trial court rendered judgment in accordance with the jury's verdict and Fleming appeals.
A trial court may terminate the parent-child relationship if the fact finder determines that a parent committed one or more of the acts contained in section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001 (Vernon 2002). Each required finding must be based on clear and convincing evidence. Tex. Fam.Code Ann. § 161.206(a) (Vernon 2002).
When reviewing the evidence for factual sufficiency, we must determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the State's allegations. In re C.H., 89 S.W.3d 17, 25 (Tex.2002); In re J.R.K., 104 S.W.3d 341, 342-43 (Tex.App.-Dallas 2003, no pet.). In making this review, we must give due deference to evidence that a fact finder could reasonably have found clear and convincing. In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002). We consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its findings. Id.
*810 In issues one and two, Fleming challenges the jury's findings that (1) she either knowingly placed or knowingly allowed R.F. and L.C. to remain in conditions or surroundings that endangered their physical and emotional well-being or (2) she engaged in conduct that endangered their physical or emotional well-being and (3) termination was in the children's best interest. See Tex. Fam.Code Ann. § 161.001(1)(D), (E) & (2) (Vernon 2002). If the evidence is factually sufficient to support findings under either subsection (D) or (E) and that termination is in the children's best interest, the judgment will be affirmed.
After reviewing all the evidence, we conclude the jury could reasonably form a firm belief or conviction that appellant engaged in conduct that endangered the physical or emotional well-being of her children as set out in subsection (E). Under subsection (E), the cause of danger to the child must be the parent's conduct alone, including the parent's actions or omissions or failures to act. See In re S.H.A., 728 S.W.2d 73, 83-84 (Tex.App.-Dallas 1987, writ ref'd n.r.e.). If the evidence shows a course of conduct having the effect of endangering the child's physical or emotional well-being, then a finding under subsection (E) is supportable. Dallas County Child Protective Servs. v. Bowling, 833 S.W.2d 730, 733 (Tex.App.-Dallas 1992, no writ).
The term "endanger" is more than just the threat of abstract injury or the possible ill effects of a less-than-ideal family environment, but an action which exposes the child to loss or injury or jeopardizes the children's emotional or physical health. Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.1987). The parent's conduct before and after the child is born is relevant. See Dupree v. Tex. Dep't of Protective & Regulatory Servs., 907 S.W.2d 81, 85 (Tex.App.-Dallas 1995, no writ). The use of drugs during pregnancy may be conduct which endangers the physical and emotional well-being of the child. Id. at 84. Circumstantial evidence may be sufficient to support termination. In re S.H.A, 728 S.W.2d at 86.
Fleming presents several reasons why the Department's evidence fails to support termination. In particular, she contends (1) evidence of her drug use was insufficient because neither child was physically or emotionally endangered by her use of marijuana; (2) her prior suicide attempts were simply "cries for help," rather than serious attempts, and she had not engaged in any such behavior since the birth of her two children; (3) she had not assaulted anyone since her children's birth and, years earlier, had been diagnosed with bipolar disorder with a symptom being aggressive behavior; (4) she called police when her on-again, off-again boyfriend physically abused her; and (5) she was striving to complete the service plan and loved her children.
Fleming's arguments ignore the evidence as a whole of her continuing course of destructive conduct. Although young, Fleming had a history of violent, aggressive behavior towards others, used illegal drugs, and attempted suicide numerous times. While some of her behavior might be predictable given her circumstances, the question is not why Fleming engaged in the conduct she did, but whether the conduct presented a danger to her children. She attempted suicide while pregnant with R.F. and threatened suicide knowing she was pregnant. She used drugs when she was pregnant with R.F., as evidenced by the positive drug test at his birth, and continued to use drugs after L.C.'s birth. Fleming testified both her drug use and suicide attempts were the result of stress, yet she did little, if anything, *811 to learn to manage stress and refused to participate in recommended outpatient drug counseling.
When the Department removed the children, it developed a service plan with a goal to reunify mother and child. The plan involved counseling, parenting classes, drug assessment, and psychological evaluation. Fleming's commitment was questionable given that she had not completed one goal more than a year after the plan took effect. We recognize Fleming was ill during some of this time, but that accounts for only weeks of a fourteen-month period. While she did eventually complete some of the above goals, no significant changes were detected in her parenting skills. She did not follow the recommendations of the drug assessment, refusing to accept expert opinion that she had a drug problem. Fleming testified she used marijuana knowing that her drug use was one of the reasons her children were in foster care. She also refused to continue counseling on issues related to her childhood abuse, which experts testified was vital to resolving past issues so that she could effectively parent her children. Despite these experts' opinions, Fleming believed counseling was a waste of time.
During her pregnancy with L.C., Fleming was beat up by two "crackheads" and her boyfriend, whom she continued to stay with even though he beat her knowing she was pregnant. Her current boyfriend had a history of drug arrests and had been jailed as late as January 2002. Fleming knew the man had a past drug history but believed he had changed, claiming he did not use drugs around her and she had not seen him selling drugs. She did not know what the man did when she was not around.
In short, the evidence showed Fleming's conduct before, during, and after the births of her sons presented more than just the threat of abstract injury. Having reviewed all the evidence, we conclude the jury could have found by clear and convincing evidence that Fleming's continuing course of conduct was a danger now and in the future to her children's emotional and physical well-being. We resolve issues one and two against her.
Once a violation of section 161.001(1) has been found, the trier of fact must then determine whether terminating the parent-child relationship is in the children's best interests. Tex. Fam.Code Ann. § 161.001(2) (Vernon 2002). Because the relationship between a parent and a child is of constitutional dimensions, there is a presumption that the best interest of the child will be served by preserving that relationship. Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex.1976). To determine whether termination is in a child's best interest, the jury may consider a number of factors, including:
(1) the child's desires;
(2) the child's present and future emotional and physical needs;
(3) the present and future emotional and physical danger to the child;
(4) the parenting abilities of the individuals seeking custody;
(5) the programs available to those seeking custody to help promote the best interest of the child;
(6) the plans those seeking custody have for the child;
(7) the stability of the home or proposed placement;
(8) any acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and
(9) any excuse for the parent's acts or omissions.
*812 See Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex.1976). The Holley test focuses on the best interest of the child, not the best interest of the parent. D.O. v. Tex. Dep't of Human Servs., 851 S.W.2d 351, 358 (Tex.App.-Austin 1993, no writ). The need for permanence is the paramount consideration for a child's present and future physical and emotional needs. The goal of establishing a stable, permanent home for a child is a compelling governmental interest. Dupree, 907 S.W.2d at 84.
The evidence showed that Fleming had made few plans for the birth of either child. While pregnant with R.F., Fleming did not have either a crib or car seat in preparation for his birth. She did not obtain prenatal care on her own and received care once or twice when the Department arranged the visits. Fleming had no job and no income. With respect to L.C., Fleming made some preparations. She had a crib at her home with Cook (her physically abusive boyfriend) and had selected a pediatrician. Her income consisted of earnings from babysitting and doing hair.
Fleming regularly visited her sons, but there was concern over her inability to be aware of both children at the same time. One Department worker testified that R.F. wandered out of the visitation room without her knowledge because she was focused on L.C. The experts, Montani and Wiggings, both expressed doubt that she could adequately parent the children. Montani testified Fleming needed counseling to overcome issues related to her abuse as a child and believed these issues would result in physical or emotional harm to the children. According to Montani, there would be "issues of neglect" if the children were returned to her. Because Fleming had refused counseling and had chosen to "resolve" the issues by forgetting about them, Montani testified termination of parental rights was the only way to break the cycle of abuse.
Fleming did not fare much better under Wiggings's psychological evaluation, demonstrating "very poor coping skills, poor decision making, immaturity in her relationships." Her profile reflected the type of person who resented the demands placed on her, was moody, tended to rationalize her decision making, and used denial as a defense mechanism. Wiggings believed Fleming's past self-destructive conduct was a good indication as to how she would react in the future in unhealthy ways.
Although no one disputed Fleming loved the children, the possibility of losing them was not sufficient motivation for her to pull her life together. The Department set goals for Fleming in hopes of returning the children, but she had not completed one goal more than one year after R.F.'s removal. In fact, it was only weeks before trial that some of the services were completed. She lived in an unstable environment and stayed with one man who was physically abusive. Her latest boyfriend had a history of drug arrests.
Department witnesses testified both boys were adoptable. While the Department could not guarantee the two boys would be adopted by the same family, it believed there was "high likelihood" that it could find a home where the two could be adopted together. If the Department was unsuccessful, it would then strongly recommend to the respective adoptive homes that the siblings be allowed visits with each other on a regular basis. If one of the families was opposed to such visitations, the Department would reconsider the adoption.
Finally, we have recited the evidence of Fleming's continuing course of destructive conduct that included drug use, suicide attempts, and aggressive behavior, all of *813 which present a danger to R.F. and L.C. We acknowledge that she was certainly at a disadvantage given the circumstances of her physical and sexual abuse as a child. And while the Department could have perhaps handled Fleming's case as a child in a different manner, she did little to help herself. Even after the births of her sons, she refused services that would have benefitted her as a mother.
Having reviewed the evidence as a whole, we conclude the jury could reasonably form a firm belief or conviction that termination of Fleming's parental rights was in the best interests of R.F. and L.C. We resolve the third issue against Fleming.
We affirm the trial court's judgment.