COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-08-064-CV

 

 

IN THE INTEREST OF R.L. AND A.L., CHILDREN                                        

 

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

In three issues, Appellant Christen L. appeals
the termination of his parental rights to R.L. and A.L.[2]  We affirm.

I. Factual and Procedural History








R.L. was born in 1998 and A.L. was born in
2001.  The girls= mother,
Christy L., had the care, custody, and control of the children from birth,
along with another female child, B.S., to whom she gave birth in 2003.[3]  Appellant is not B.S.=s fatherCby some
point in 2002 or 2003, Appellant had left the home, and his next interaction
with the children did not occur until 2007. 
While the children lived with Christy L. in Corpus Christi, there were
numerous referrals to Child Protective Services (CPS) for neglectful
supervision and drug abuse, as well as sexual abuse of R.L. by third persons.

        In July 2006, Christy L. voluntarily placed the children with
her mother and stepfather, who subsequently moved with the children to Fort
Worth. Allegations of drug use, drug sales, and excessive physical discipline
of the children led CPS to remove the children from the maternal grandparents
and to place them into foster care in November 2006.  The State cited both Appellant and Christy L.
by publication when it initially filed suit in November 2006 because the location
of both parents was unknown.  Both Appellant
and Christy L. eventually appeared and executed waivers of service.








Neither Christy L. nor Appellant attended the
termination trial, and their attorneys did not put on any witnesses.  The trial court granted the State=s
petition to terminate Appellant=s
parental rights,[4]
finding by clear and convincing evidence that Appellant knowingly placed or
knowingly allowed the children to remain in conditions or surroundings that
endangered their emotional or physical well-being; that Appellant engaged in
conduct or knowingly placed the children with persons who engaged in conduct
that endangered their physical or emotional well-being; that Appellant
constructively abandoned the children; and that termination of Appellant=s
parental rights, if any, would be in the best interest of the children. See
Tex. Fam. Code Ann. ''
161.001(1)(D), (E), (N) & (2) (Vernon Supp. 2007). It also found that
Appellant did not respond by filing an admission of paternity or counterclaim
for paternity or for voluntary paternity to be adjudicated before the final
hearing.[5]  See id. ' 161.002(b)(1).


II. Discussion








In his first two issues, Appellant contends that
the evidence was legally and factually insufficient to support the trial court=s
findings of endangerment and constructive abandonment.[6]  Along with a best interest finding, a finding
of only one ground alleged under section 161.001(1) is sufficient to support a
judgment of termination.  In re E.M.N.,
221 S.W.3d 815, 821 (Tex. App.CFort
Worth 2007, no pet.).  Appellant does not
challenge the trial court=s best interest finding. 

A. Legal and Factual Sufficiency

1. Standard of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to
recognize the constitutional underpinnings of the parent-child relationship, it
is also essential that emotional and physical interests of the child not be
sacrificed merely to preserve that right.@  In re C.H., 89 S.W.3d 17, 26 (Tex.
2002).  In a termination case, the State
seeks not just to limit parental rights but to end them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  TEX. FAM. CODE ANN. '
161.206(b); Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination
proceedings and strictly construe involuntary termination statutes in favor of
the parent.  Holick, 685 S.W.2d at
20B21;
E.M.N., 221 S.W.3d at 820.

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  TEX. FAM. CODE ANN. '
161.001; In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination of parental rights is a drastic
remedy and is of such weight and gravity that due process requires the
petitioner to justify termination by clear and convincing evidence.  TEX. FAM. CODE ANN. ''
161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002).  This intermediate standard falls between the
preponderance standard of ordinary civil proceedings and the reasonable doubt
standard of criminal proceedings.  In
re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d 77,
83 (Tex. App.CFort Worth 2006, pet.
denied).  It is defined as the Ameasure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.@ 
Tex. Fam. Code Ann. '
101.007.

In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a fact-finder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
fact-finder resolved any disputed facts in favor of its finding if a reasonable
fact-finder could have done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could, and disregard contrary evidence unless a
reasonable fact-finder could not.  Id.








We must therefore consider all of the evidence,
not just that which favors the verdict. 
Id.  But we cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations
as long as they are not unreasonable.  Id.
at 573.

In reviewing the evidence for factual
sufficiency, we must give due deference to the fact-finder=s findings
and not supplant the judgment with our own. 
In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We must determine whether, on the entire
record, a fact-finder could reasonably form a firm conviction or belief that
the parent violated subsections (D), (E), or (N) of section 161.001(1).  C.H., 89 S.W.3d at 28.  If, in light of the entire record, the
disputed evidence that a reasonable fact-finder could not have credited in
favor of the finding is so significant that a fact-finder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108. 

2. Endangerment 








In his first issue, Appellant challenges the
legal and factual sufficiency of the evidence to support the trial court=s
findings under section 161.001(1)(D) and (E), contending that he was not
involved in or ever informed about any of the CPS referrals in Corpus Christi,
that he was not aware of the children=s
situation in the Fort Worth home, and that he was not notified of the children=s
removal.  Appellant also claims that the
State put on no evidence that he had any knowledge that the children might have
been endangered by Christy L.=s
actions.  He contends that there was no
evidence presented at trial regarding his early years around the children, his
relationship with Christy L., or his prior contact with the children, that no
home study was ever performed on his home, and that no criminal history was
introduced.  

The court may order termination of the parent‑child
relationship if the court finds by clear and convincing evidence that the
parent has:

(D) knowingly placed or
knowingly allowed the child to remain in conditions or surroundings which
endanger the physical or emotional well‑being of the child;

 

(E) engaged in conduct or
knowingly placed the child with persons who engaged in conduct which endangers
the physical or emotional well‑being of the child;

 

Tex. Fam. Code Ann. ' 161.001(1)(D)
& (E).  Because the evidence
pertaining to subsections (D) and (E) is interrelated, we may conduct a
consolidated review.  In re M.C.T.,
250 S.W.3d 161, 169 (Tex. App.CFort
Worth 2008, no pet.).  For purposes of
these subsections, 

A[E]ndanger@ means
more than a threat of metaphysical injury or the possible ill effects of a less‑than‑ideal
family environment, [but] it is not necessary that the conduct be directed at
the child or that the child actually suffers injury.  Rather, Aendanger@ means
to expose to loss or injury; to jeopardize. 


Boyd, 727 S.W.2d at 533; In re J.M.M., 80
S.W.3d 232, 241 (Tex. App.CFort
Worth 2002, pet. denied), disapproved on other grounds, In re J.F.C.,
96 S.W.3d 256 (Tex. 2002).  








Subsections (D) and (E) both focus on
endangerment, but they differ with regard to the source and proof of
endangerment.  In re S.M.L., 171
S.W.3d 472, 477 (Tex. App.CHouston
[14th Dist.] 2005, no pet.).  Subsection
(D) concerns the child=s living environment, rather
than the parent=s conduct, though parental
conduct is certainly relevant to the child=s
environment.  Id.;  In re J.T.G., 121 S.W.3d 117, 125
(Tex. App.CFort Worth 2003, no pet.); In
re D.T., 34 S.W.3d 625, 632 (Tex. App.CFort
Worth 2000, pet. denied).  Although the
parent need not have certain knowledge that an actual injury is occurring, the
parent must at least be aware of the potential for danger to the child in such
an environment and must have disregarded that risk.  In re C.L.C., 119 S.W.3d 382, 392
(Tex. App.CTyler 2003, no pet.). 








Under subsection (E), the relevant inquiry is
whether evidence exists that the endangerment of the child=s
physical or emotional well‑being was the direct result of the parent=s
conduct, including acts, omissions, and failures to act, and it must be based
on more than a single act or omission; a voluntary, deliberate, and conscious
course of conduct by the parent is required. 
J.T.G., 121 S.W.3d at 125; J.M.M., 80 S.W.3d at 241; see
also In re R.F., 115 S.W.3d 804, 810_11 (Tex. App.CDallas
2003, no pet.) (holding, under subsection (E), that parent=s
failure to complete service plan, among other facts, supported termination of
parental rights); In re U.P., 105 S.W.3d 222, 236 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied) (holding that the creation of an Aemotional
vacuum@ in the
child=s life
by being absent for more than twelve months, even due to incarceration, was evidence
of endangering the child=s emotional well-being); In
re M.J.M.L., 31 S.W.3d 347, 351_52 (Tex. App.CSan
Antonio 2000, pet. denied) (holding that evidence that the father knew the
pregnant mother was a drug abuser but still disappeared for five months at the
end of her pregnancy and failed to make arrangements for the care of his
soon-to-be-born child during the time he was gone, choosing instead to leave
the child in the care of a drug-addicted mother, was evidence of
endangerment).  

Placement with an abusive parent or relative is
endangerment under either subsection (D) or (E).  See In re J.M.C.A., 31 S.W.3d 692, 698
(Tex. App.CHouston [1st Dist.] 2000, no
pet.)  (terminating parental rights of
mother who allowed children to remain with abusive father).  

3. Analysis

a. Testimony about Appellant








In the affidavit supporting publication of the
citation for Appellant, Lisa G., the children=s
maternal grandmother, reportedly told CPS that she Aha[dn=t] heard
from [the father] in 100 years.@  However, after the children had been in
foster care for several months, the children=s
paternal grandparents discovered this and notified Appellant.  Between July and September 2007, Appellant
traveled from Louisiana to visit the children.

Nina Longley, the CASA volunteer who was assigned
to R.L. and A.L.=s case, testified that R.L.
recognized Appellant on his first visit, but that A.L. did not, and that
Appellant told her that he had not seen the girls in four years.   R.L. and A.L.=s foster
mother testified that R.L. remembered Appellant, but that A.L. remembered
someone else as her father.  Longley
testified that Appellant=s visits began in July 2007 and
stopped in October 2007, when Ahe was
arrested and went to jail,@ and
that after he got out in December 2007, he did not resume his visits.








Whitney Lagadinos, the children=s CPS
caseworker, testified that CPS developed a service plan for Appellant and
located a service provider for him in Louisiana, but that he failed to complete
anything in the plan besides one drug test, which was clean, and his visits
with the children.  She testified that
Appellant missed his visit with the children in October 2007 because he was
arrested for domestic abuse and false imprisonment of his live-in
girlfriend.  She testified that Appellant
did not try to make any contact with CPS or to continue visits with the
children after October 2007, although she had been willing to set up services
for him when he got out of jail, her contact information had not changed, and
Appellant knew how to get in touch with CPS. 
She also testified that, after she got a copy of the police report, she
did not think that he would be a proper placement for the children.[7]  When questioned about domestic violence in
her psychological evaluation, Christy L. indicated that Appellant was physically
abusive and that he had received a probationary sentence as a result of his
assaultive behavior.

Lagadinos described the children=s
reaction to the fact that Appellant and other relatives were no longer being
considered for placement as,

They have been upset, but
it seems as though they=re used to being let
down, and they have stated that their [foster] mom, which . . . they call Mom,
that she is the only one that has been consistent, the only one that loves and
cares about them. . . . [With regard to Appellant no longer being considered,]
[R.L.] was angry about it.  She wasCShe seemed angry with her
father. . . . They appeared angry [and hurt]. . . . [T]hey asked me if they
could just stay with Mom.  And when I
told them that was going to be our next option, they were happy about it. 

 

Longley testified about the children=s
reaction as follows:

Q.     What
reaction did you observe when all of a sudden a plan would change in terms of
going to their mother or going to their father or to relatives?  How did the children respond to that?

 

A.     They
adjusted much better than I would have. . . . You know, they wereCthey probably expressed
more disappointment in not being able to go to Florida [to live with a
great-aunt].

 








The children=s foster
mother testified, with regard to the changing plans for the children,

Q.     WasCWere these children aware
or did they talk about their thinking that there was a plan that they were
going to go back and live with their mom?

 

A.     Yes.  Their mom was telling them that she was
getting everything together, she was complying with the classes and stuff, and
this is when they went on visits.

 

Q.     Okay.
Did they seem excited about that plan?

 

A.     Yes.

 

Q.     And
then sometime in the summer months, did they realize their mom was not coming
to visits any more?

 

A.     Yes.

 

Q.     Okay.  And did they have a reaction to that?

 

A.     [R.L.]
just said, my momma don=t care about us.  And that=s what everyCall the people that=s come in to take them,
[R.L.] just says nobody cares.

 

Q.     And
then when [Appellant], the alleged father, came in and starting having visits,
did the girls talk at all with you about a plan of going to live with him?

 

A.     They
were excited.  They don=t really understand orCor know what happened to
their dad.

 

Q.     Have
they had any reaction to his absence in their life?

 

A.     No,
not really.

 








Q.     And
then there has been a relative in Florida that was a proposed plan for a period
of time.  Were the girls aware that they
may go live with an aunt in Florida?

 

A.     They
[were].

 

Q.     And
how did they feel about that?

 

A.     They were excited, but [A.L.] was more
excited because the auntie pampered them with things they were going to have,
fish aquariums, they were going to have a room to themselves.  And when it didn=t
happen, [R.L.] was like, [A]she
lied.[A]

b. Testimony about Christy L.

The evidence at trial, including Christy L.=s 2007
psychological evaluation, showed that Christy L. had an Aextensive
history of irresponsibility, instability, and drug use,@ and
that she started using drugs before either child was born and continued to do
so while the children lived with her. 
Christy L.=s drug use included marijuana,
crack cocaine, and methamphetamine.[8]  In her psychological evaluation, she admitted
that she had used marijuana for approximately ten years, with her last usage in
October 2006, and that she had used it daily for five years. 








Christy L.=s
psychological evaluation revealed that she had been charged with attempted
aggravated assault in 1999.  Michelle
Sparks, who was a CPS investigator in 2006, testified that when she interviewed
the children in July 2006, R.L. and A.L. told her that Christy L. would beat
them with a broom.  She also testified
that R.L. Awas able to describe how her
mother would smoke crack with a small pipe as well as with a bigger pipe@ and to
draw a picture of those pipes, and to demonstrate how her mother was able to
smoke Aweed.@ Sparks
testified about the various allegations CPS had investigated with regard to
Christy L. and the children, starting in January 2003.

The children=s foster
mother testified that then-eight-year-old R.L. told her about sexual abuse by
three different adult males,[9]
including Lindsey S., the father of Christy L.=s
daughter B.S.; that she watched Christy L. smoke cocaine with a pipe, that
Christy L. used Aweed and crack@ a lot,
and that she had smoked marijuana with Christy L.; and that her mother had hit
her and A.L. with a broom handle and left bruises.

c. Additional testimony








Lagadinos testified that she believed that
Appellant had constructively abandoned the children and that termination of
Appellant=s parental rights to the
children was in their best interests, aside from the arrest, because Ahe had
not been in contact with these girls throughout most of their lives.@  Longley testified that the children were
doing well in foster care, that the foster mother had expressed interest in
adopting the children, and that she believed that it was in their best
interests that Appellant=s and Christy L.=s
parental rights be terminated.  The
children=s foster
mother testified that she was interested in adopting both children.

The children=s
attorney ad litem stated to the trial court that the fact that the parents Ahaven=t taken on
any initiative to work services and be in contact with CPS . . . is very
problematic and has been painful and difficult for these children,@ and
that he believed it would be in the children=s best
interests for both parents= rights
to be terminated so that the children could be free for adoption.  

d. Conclusion








Although Appellant complains that he was not
aware of the CPS reports, no explanation was provided at trial for his
departure from the children=s lives
around 2002 or 2003, or his failure to return to them until 2007.  The 1998_2003 time frame in which
he was last involved with the children overlapped with Christy L.=s
description of her drug use history, which began before R.L. was born.  The trial court could have reasonably
concluded from the evidence at trial that Appellant abandoned the children to
the care, custody, and control of a known drug user.  See J.M.C.A., 31 S.W.3d at 698;
M.J.M.L., 31 S.W.3d at 351_52.  Appellant emotionally abandoned the children
twice: once by failing to contact them for four years, before starting to visit
them again in July 2007, and then again by failing to resume contact upon his
release from jail in December 2007.  See U.P., 105 S.W.3d at 236.  And he failed to complete his service plan,
even though CPS made arrangements for him to be able to complete the services
in Louisiana.  See R.F., 115
S.W.3d at 811.

Reviewing the evidence in the light most
favorable to the finding and judgment, we determine that the trial court could
have reasonably formed a firm belief or conviction with regard to the
endangerment grounds under subsections (D) and (E).  See J.P.B., 180 S.W.3d at
573.  Furthermore, on the entire record,
we determine that the trial court could have reasonably formed the same firm
conviction or belief.  See C.H.,
89 S.W.3d at 28.  Therefore, because the
evidence at trial was legally and factually sufficient to support the
termination of Appellant=s parental rights under
subsections (D) and (E), we overrule Appellant=s first
issue.  We need not reach his second or
third issues.  See E.M.N., 221
S.W.3d at 821; see also Tex. R.
App. P. 47.1. 








 

 

 

 

III. Conclusion

Because we overrule Appellant=s first
issue and because we need not address his second and third issues, we affirm
the judgment of the trial court.

 

PER
CURIAM

 

PANEL F:    MCCOY, LIVINGSTON,
and DAUPHINOT, JJ.

DELIVERED: July 31, 2008











[1]See Tex.
R. App. P.
47.4.





[2]To protect the privacy of
the parties involved in this appeal, we identify the children by initials only
and the mother and grandparents by their first names and the first initial of
their last names only.  See Tex. Fam. Code Ann. ' 109.002(d) (Vernon
2002).





[3]Christy L. also has two
older children who live in Oklahoma with her ex-mother-in-law.  Appellant is not the father of these
children. 





[4] Christy L.=s parental rights to R.L.
and A.L. were terminated in the same proceeding, but she does not appeal. 





[5]Appellant briefed this as
his third issue.  However, based on our
holding, we need not address it.





[6]The State contends that
Appellant=s issues were not
sufficiently preserved under section 263.405(i) because they were not
sufficiently specific. We decline to consider this argument.  See In re D.W., 249 S.W.3d 625, 645
(Tex. App.CFort Worth 2008, pet.
denied) (en banc) (ASection 263.405(i) is
void because it violates the Separation of Powers Clause of the [Texas]
constitution.@).





[7]The police report was not
admitted into evidence at trial. 





[8]Christy L. did not test
positive for drugs when she gave birth to B.S. on October 10, 2003, but she did
test positive throughout her pregnancy for methamphetamine: on April 22, 2003;
June 11, 2003; July 15, 2003; and October 6, 2003.  CPS investigated an allegation of neglectful
supervision of R.L., A.L., and B.S. by Christy L. on October 20, 2003; drug
paraphernalia was located in her home and CPS ruled Areason to believe@ on this referral.





[9]Sparks described a CPS
investigation made on an allegation of sexual abuse on January 31, 2003,
involving R.L. and Christy L.=s seventeen-year-old brother, who Christy L.
brought in around November 2002 to take care of the children because she went
to jail and then because she and Lindsey S. were working nights.  The case was ruled Areason to believe.@