

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-14-00206-CV

IN THE INTEREST OF A.N. AND
J.N., JR., CHILDREN

----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 323-98825J-13

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

This is an ultra-accelerated appeal[2] in which Appellants Father and Mother

appeal the termination of their parental rights to their children Amy and Jack.[3]  In

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[3]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights).

three issues, Father argues that the evidence is legally and factually insufficient to support the endangering-environment, endangering-conduct, and best-interest findings under Texas Family Code section 161.001(1)(D) and (E) and section 161.001(2). *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (2) (West 2014). In three issues, Mother argues that the evidence is legally and factually insufficient to support the endangering-environment and endangering-conduct findings under Texas Family Code section 161.001(1)(D) and (E) and that the evidence is factually insufficient to support the best-interest finding under section 161.001(2). *See id.* We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Overview

The record reveals that the Department of Family and Protective Services (the Department) has been involved in Father's and Mother's lives since shortly after the birth of their daughter Amy in February 2011. The record reveals numerous referrals for neglectful supervision and physical neglect of the children by Father and Mother, for alleged drug use by Father and Mother, and for alleged drug use by the extended family members with whom Father and Mother allowed the children to stay. The record also reveals that Father and Mother failed to establish stable housing throughout this case and that they failed to complete their services. Because Father and Mother challenge both the sufficiency of the evidence to support the endangerment grounds as well as the best-interest ground, we set forth a detailed summary of the record below.

## B. Prior CPS History

The affidavit attached to the "Petition for Protection of Children, for Conservatorship, and for Termination in Suit Affecting the Parent-Children Relationship" (the affidavit), along with some of the testimony at the termination trial, sets forth Father's and Mother's prior CPS history.

### 1. February 7, 2011

On February 7, 2011, the Department received a referral for neglectful supervision of Amy by Father and Mother. The allegations included the following: Mother tested positive for opiates when she gave birth to Amy but produced a prescription for Vicodin; Mother admitted smoking marijuana while she was pregnant; Father appeared under the influence of drugs while at the hospital; Father tested positive for opiates but produced a prescription for Vicodin; Father admitted to smoking marijuana; Maternal Grandmother and Paternal Grandmother admitted to using drugs in the past; Maternal Grandmother tested positive for methamphetamine and amphetamine; and Paternal Grandmother's drug test was invalid. The affidavit states that the allegations regarding Father's and Mother's drug use were validated because Father and Mother left Amy in the care of Maternal Grandmother and Paternal Grandmother while Father and Mother left to smoke marijuana. The Department opened a Family-Based Safety Services (FBSS) case and provided services from April 2011 to December 2011, but Father and Mother did not complete services with FBSS.

## 2.  June 11, 2011

On June 11, 2011, the Department received a referral for neglectful supervision of Amy by Father and Mother and for physical abuse of Amy by Father.[4]  The referral alleged that Father and Mother were stealing Paternal Grandmother's pain medications, antidepressants, and muscle relaxers and that they were using K2.  The referral further alleged that Father had thrown Paternal Grandmother on the bed and had broken things because he had run out of Paternal Grandmother's pills.  The referral also alleged that Father and Mother were using Paternal Grandmother for her money and that she could not meet her own needs as a result.  An Adult Protective Services (APS) case was opened for Paternal Grandmother, who was living at the Cowboy Inn.  The APS caseworker noted that Paternal Grandmother, Father, and Mother did not seem credible, and she was concerned about their drug-seeking behavior.  Father and Mother tested negative for drugs.  The family agreed to not abuse medication and to continue to work services with FBSS.  Both allegations—for neglectful supervision of Amy by Father and Mother and for physical abuse of Amy by Father—were ruled out, and the services with FBSS were not completed because the Department could not locate the family.

---

[4]The record does not specify what the alleged physical abuse consisted of.

### 3. September 2011

The September 2011 referral alleged that Father, Mother, Amy, and Paternal Grandmother were staying at the Cowboy Inn and that all three adults were smoking K2 in front of Amy.[5] There were also allegations that the adults were using drugs intravenously and were using prescription medications. The Department was concerned because there was no way the adults could take care of seven-month-old Amy's needs while they were under the influence.[6] Escajeda testified that she made contact with Father and Mother at the motel. Escajeda had some concerns about the motel room, but the family was in the process of packing and leaving the room because the police had done a welfare check the night before and had told them that it was a dangerous place for them to be with a child. The parents did not tell Escajeda where they were relocating, which concerned Escajeda because a case had been opened for services from FBSS and the Department needed to be able to locate the family to offer them the services from FBSS and to check on Amy's welfare.

While at the motel, both parents agreed to do an oral swab drug test. Father and Mother tested positive for opiates but produced a prescription to explain their positive drug tests. Father and Mother denied using any drugs,

[5]Gina Escajeda, a current caseworker and former investigator with CPS, testified that K2 was a legal drug in 2011.

[6]Escajeda testified that "any time anybody's intoxicated from any substance, they're not able to provide adequate care for their children."

including synthetic marijuana, and said that drugs were not a problem for them. Escajeda testified that she was very concerned about Paternal Grandmother, who appeared to be under the influence and was not able to give a drug test. Escajeda testified that there were also concerns that Paternal Grandmother was in an abusive relationship.

The safety plan stated that Paternal Grandmother could not be a caregiver for Amy and could not be left unsupervised with Amy, that the family would maintain contact with CPS and let CPS know their address, and that the family should contact the police if Paternal Grandmother's allegedly abusive husband had contact with them or was trying to contact them. Escajeda testified that Father and Mother said that they were afraid to call their FBSS caseworker because they did not have a place to stay and that they could not attend classes because they did not have transportation.

### 4. December 6, 2011

On December 6, 2011, the Department received a referral for neglectful supervision of Amy by Mother, Paternal Grandmother, and Father. The referral alleged that Father, Mother, and Paternal Grandmother were living in a motel and were all using drugs and that Father and Mother were smoking K2, "ICE," and opiates in front of Amy. The Department was unable to locate the family, and the case was not able to be completed.

## 5. December 22, 2011

Keriann Wellinghof, an investigator with CPS, testified that she had a case involving Father and Mother on December 22, 2011. The referral alleged that Father, Mother, and Paternal Grandmother were living in a motel together and that they were using drugs, including K2, methamphetamine, Soma, hydrocodone, and Klonopin. A night-response worker attempted to contact the family on December 22 and 23, and Wellinghof's supervisor contacted Father by phone on December 23. Wellinghof called Mother on December 27 and 28 and attempted a visit on December 30 at their last known address but was unable to make contact with the family. Wellinghof testified that when CPS is unable to locate a family, CPS is unable to verify that the children are safe. Wellinghof said, "We don't know what's going on, what household they're living in, what they're exposed to when we can't meet with them face-to-face." Wellinghof verified that Amy was current on her shots, ruled out the allegations, and closed the case.

## 6. January 2012

In January 2012, the Department re-entered the December 6, 2011 case due to the unable-to-complete disposition. The affidavit states that the family made contact with the worker at a CPS office and reported that Paternal Grandmother is a heavy IV drug user and "shoots up" drugs with her husband. Father and Mother believed that Paternal Grandmother and her husband had called in the December 6 referral in retaliation for Father and Mother's turning in

Paternal Grandmother for food stamp fraud.  The Department was unable to locate the family after this conversation.

### 7.  July 2012

In July 2012, the Department received a referral for neglectful supervision of Amy by Father and Mother.  The referral alleged that Father was using synthetic marijuana, which could impair his judgment and his ability to adequately care for Amy.  The referral stated that it was unknown how Amy had been affected by Father's use of synthetic marijuana and that it was unknown whether Mother was willing to protect or capable of protecting Amy.  The referral stated that the police found Father in possession of K2 and rolling papers and that Mother was pregnant and smoking cigarettes.  The Department attempted to locate the family, but they had left the Union Gospel Mission where they had tested negative on an oral drug screen in May 2012.  A special investigator was assigned to the case to assist in locating the family, but the family was not located.  The allegations were ruled "unable to complete."

### 8.  April 5, 2013

Nine months later on April 5, 2013,[7] the Department received a referral for neglectful supervision and physical neglect of Amy and Jack by Father and Mother.  The referral alleged that the family had been living out of a van parked

---

[7]Mother gave birth to Jack on September 1, 2012.

in a car wash next to a convenience store.[8]   The referral further alleged that Father and Mother were using drugs and that Father was heard yelling at Amy.  It was noted that the children's demeanor appeared sickly.  Escajeda attempted to find the family but was unable to do so.  Escajeda utilized a special investigator with CPS, who located the family on April 15 and left his business card with them.

### 9.  April 16, 2013

On April 16, 2013, the Department received a second intake that the family was living out of a vehicle and had been living like that for a couple of weeks.

On April 18, Escajeda made contact with the family at the same residence where the special investigator had found them, which was a residence belonging to a friend of the family.   Escajeda told Father and Mother that their homelessness was a concern and asked if they would consider FBSS.[9] Escajeda told Father and Mother that they could not stay in their car that evening because it was going to be really cold that night, and their friend allowed them to stay that night.  Father and Mother signed the safety plan stating that they would seek homeless shelter assistance, that the children would not sleep outdoors that evening, and that they would continue to meet the children's basic needs and

---

[8]Escajeda testified that nothing had changed from September 2011 to April 2013; the family was still struggling and lacked stability.

[9]Escajeda agreed that it is not against the law to be homeless or to live in hotels.

cooperate with CPS. Father and Mother failed to maintain contact with CPS. The Department offered the family services through FBSS, but the family did not cooperate with the assessment.

## 10. May 1, 2013

On May 1, 2013, Escajeda received a phone call from a police officer stating that Father had been arrested for theft.

## 11. May 8, 2013

On May 8, 2013, Escajeda went by Father and Mother's friend's house and saw Father and Mother walking down the road. Father and Mother informed Escajeda that they were on the way to visit their friends; that they had sold their car; that Mother had stayed with her father when Father went to jail the previous week on the theft charge; that they had been staying at the Greenway Inn for the previous couple of days; and that a friend had offered them a place to stay for a couple of days but that Father did not know the address. Escajeda told Father and Mother to utilize Union Gospel Mission and some of the other shelters; Escajeda said that the family was already aware of homeless resources. Escajeda told Father and Mother that FBSS would be contacting them to perform an assessment and to discuss services. Mother provided Escajeda with their phone number, and Father and Mother signed medical release forms for Escajeda to obtain the children's medical records. Escajeda located medical records for Amy but not for Jack, which was a concern because there was no record of his having well-baby checkups. When Escajeda sent the release to the

pediatrician, the only information that Escajeda received was that a new patient appointment had been scheduled for Jack, but the parents were a no-show. Thus, Jack had not received any immunizations since birth because of missed appointments.

The FBSS worker told Escajeda that she had attempted to contact Father and Mother to start the assessment but had not received any return calls. Escajeda testified that the Department's concerns regarding the children were that the family was homeless and was not utilizing community resources that had been extended to them. Escajeda said that Father had reported in the past that he had been diagnosed with bipolar disorder but was not on medication, and Escajeda testified that was a concern because he had young children to care for. Escajeda testified that the case was disposed of as unable to determine for physical neglect and unable to determine for neglectful supervision for both children by both parents.

### 12. June 13, 2013

CPS utilized the special investigator a second time to locate the family, and the special investigator located Father in jail in Tarrant County on June 13. Father was released the following day.

### 13. July 3, 2013

On July 3, 2013, law enforcement notified CPS that they needed assistance because the family was panhandling on Jacksboro Highway. Escajeda met with Father and Mother, who informed her that they had been

staying in a hotel that Paternal Grandmother had been paying for but that they had checked out of the hotel. The family had some clothing, "infant care," diapers, snacks, and toys. Escajeda allowed the children to cool off in her pickup because they appeared to be hot but were not malnourished or dehydrated. Father and Mother agreed to take drug tests and tested negative for all substances.[10]

Escajeda told Father and Mother that they needed to find a possible relative or kinship placement or go to a shelter or that foster care would become a possibility. Father and Mother had money for the bus and said that they would go to a shelter. Escajeda watched the family get on the bus; it was her understanding that they went to the Salvation Army but did not stay there for an extended period of time.

### 14. July 8, 2013

On July 8, 2013, police observed the family living behind a store, and the children were taken to the hospital for bug bites and for a diaper rash. Father and Mother told the hospital that they were planning to move to Arkansas on July 11, 2013. The affidavit noted that court-ordered services could not be pursued because the family did not have a stable residence at which to serve paperwork.

---

[10]Escajeda testified that Father and Mother were not drug tested more frequently because CPS had trouble locating Father and Mother.

## C. The Referral that Led to the Removal of the Children

On July 22, 2013, the Department received a referral for neglectful supervision and physical neglect of Amy and Jack by Father and Mother. The referral alleged the following: Father, Mother, Amy, Jack, and Paternal Grandmother had been living outside of a "convenience store/car wash" for at least two months; the family slept inside the car wash; the two-year-old child went inside the convenience store to ask for food and told a passerby that she had eaten only gummy bears for the previous two days; Father yanked the child by the arm when she said this and stated, "[D]on't tell anyone that you don't eat all the time"; the parents were intoxicated at the grocery store on July 22; the younger child was never seen with any clothing on other than diapers; the older child had been wearing the same dress for two months; the children did not have shoes on; the older child was often rinsed off with a hose because she was dirty; the parents were often seen smoking cigarettes and holding "tall boys" of beer in their hands and were often intoxicated; Father had asked patrons of the store for "dope" on several occasions; and the two-year-old child slept in a stroller, and the eight-month-old child slept in a car seat.[11]

---

[11]Also attached to the petition for protection are handwritten affidavits from two witnesses describing what they had seen at the car wash and convenience store. One of the affiants stated, "These children live on the cement at this little store every nigh[t] and all day during the heat." Both affiants stated that Amy had asked them for food.

On the afternoon of July 23, 2013, Natassia Howlett, an investigator with the Department, went to the car wash near River Oaks where the family was reported to be living.[12]  Howlett walked up to Mother and Father, and they confirmed their identities.  Howlett discussed the allegations from the referral with Father and Mother.  Father said that they had been homeless for over a year and that it could have been two or three years since they had last maintained a permanent residence.  Father and Mother said that they planned to get a house at the beginning of August and had not done so sooner because they were waiting on Paternal Grandmother to receive a disability payment.  Father and Mother said that the children always had enough food, that they receive food stamps, and that they bought food from inside the gas station or at restaurants like McDonald's.  Father and Mother denied that the children sleep in the car wash in their car seats.  Father and Mother, however, admitted that the children had slept with them one night on a pallet of blankets behind a bar down the street from the car wash but said that the children were usually with their grandmother because it was so hot and because Father and Mother felt that people would report them due to their lifestyle.[13]

---

[12]Howlett was not sure whether the car wash was in working order or had been abandoned; there were no cars in the other stalls while she was there.

[13]Howlett testified that CPS's report reflects that Father and Mother had been living in the car wash with the children for two months, but Father and Mother said that the children had not been staying at the car wash with them.

Father stated that he had not consumed alcohol in approximately three years; Father said that he worked at the convenience store and may have been seen bringing beer outside for a customer. Both Father and Mother denied any current drug use but admitted prior histories of drug use. Father admitted that ten years ago he had used methamphetamine for approximately six months; Mother admitted that she had tried methamphetamine at age sixteen or seventeen but did not like it and had not used since then; and both Father and Mother admitted using marijuana three years prior when partying with friends after Amy was born. Mother's oral swab tested negative, but Father tested positive for amphetamines and methamphetamines. Father said that the test was false[14] and then went into the convenience store; when he returned, he said that he had been fired.

Mother said that she had been diagnosed with depression and anxiety but was not on medication and did not want to be on medication. Father stated that he had been diagnosed with bipolar disorder and was not on medication but wanted to be on medication.

Mother said that Maternal Grandmother had a history of methamphetamine use; Mother was not sure if Maternal Grandmother was currently clean because Mother was not around Maternal Grandmother that much. Father said that

---

[14]Howlett testified that Father asked for a hair follicle test or a urinalysis to be performed; neither of which were approved at that time.

Paternal Grandmother also had a history of methamphetamine use, but he believed that she had been clean for three or four years.

The children were not present at the car wash. Father and Mother originally said that the children were safe and that Howlett would not be allowed to see them. Father and Mother later said that the children were with Maternal Grandmother at her house near Springtown. Father and Mother called Maternal Grandmother and asked her to bring the children to the car wash.

The children arrived with Maternal Grandmother and Paternal Grandmother. The children appeared to be clean but did not have on shoes. Howlett testified that Amy was allowed to walk around the car wash with no shoes, which was a concern because the car wash was not clean.

Howlett had concerns when she spoke with the grandmothers. Paternal Grandmother told Howlett that she had been going back and forth between Maternal Grandmother's home and living on the street for the previous couple of months and that the children had been going back and forth, too. Paternal Grandmother said that she planned to move to Arkansas in August. Paternal Grandmother admitted to using methamphetamine within the last year and to using marijuana within the previous few months. Paternal Grandmother tested negative for all substances. Paternal Grandmother said that she had been diagnosed with depression and was taking medication for that, along with pain medication for back and ankle issues. Maternal Grandmother admitted that she had three driving-while-intoxicated charges in the past. Maternal Grandmother

said that she had a history of methamphetamine use and had last used a couple of years prior. Maternal Grandmother tested positive for methamphetamines and amphetamines. Maternal Grandmother admitted that she had smoked methamphetamine with her boyfriend a few days prior and that she had used marijuana the previous night when the children were in her care. Although Maternal Grandmother failed the drug test, Howlett said that Maternal Grandmother did not appear to be under the influence while she was speaking with her.

Howlett's concerns regarding the welfare of the children were as follows: "They had very little belongings,[15] no food outside. They were obviously just sitting in the car wash. And then when I spoke with [Father,] he chose to take an oral swab. That was concerning when that screened positive for methamphetamines." Howlett was also concerned about Amy's development because she was not talking much and was not stringing words together. Moreover, Howlett had learned from police that both Father and Mother had current warrants for unpaid tickets.

Howlett asked Father and Mother if they had anyone who would be able to help them, and they said that they did not. Howlett testified that the directive she received from her program director was to allow the children to stay with

---

[15]Howlett testified that it was possible that the children's belongings had gone with them to Maternal Grandmother's house. Howlett did not look inside the family's vehicle to see if the children's belongings were inside it.

Maternal Grandmother, even though she had recently used drugs, and to pursue a nonemergency removal the next day.

The removal was granted the following day, and Howlett went to Maternal Grandmother's home to pick up the children. Howlett testified that Maternal Grandmother's home smelled "very strongly of dog urine and cigarette smoke. There were things stacked everywhere. Very hard to even walk through the residence." Howlett testified that Maternal Grandmother's home was not appropriate for children because there were way too many things that could have fallen on the small children, it smelled unsanitary, and the carpet did not look good.[16] Howlett said that the grandmothers packed up a couple of things for the children, and then Howlett took the children with her. Amy was two years old, and Jack was nine months old.

A day or two after the removal, Father called, and Howlett told him that he and Mother would need to secure a residence and employment or other way to provide for their children and that they would need to complete services, such as parenting and drug classes. Father told Howlett that he was willing to work services.

Howlett attempted to find placements for the children with other family members, but none of the relatives that Howlett contacted agreed to be a placement for the children. Instead, Howlett's conversations with the extended

_____

[16]Howlett did not take pictures of Maternal Grandmother's house.

family raised concerns. When Howlett contacted Maternal Grandfather as a potential placement, he said that he had some ongoing concerns because the parents and grandparents were abusing medication, Maternal Grandmother drank alcohol frequently, and Father and Mother "would always come and go different places."

When Howlett contacted Maternal Aunt as a potential placement, she said that she did not feel like Father and Mother were trying to fix their situation, that they put drugs before their children, that they had a history of marijuana use, that Maternal Grandmother had a history of drug use and that she could be currently using, and that she (Maternal Aunt) had heard rumors that Paternal Grandmother had a history of recent drug use. Maternal Aunt admitted that she had used drugs within the previous nine to twelve months.

When Howlett contacted Paternal Grandfather as a potential placement, he said that he had not had contact with Father in ten years; that he had never met Amy or Jack and did not know how many children there were; that Father had ongoing issues with the law, had dealt with drug issues his whole life, and had been placed in psychiatric hospitals as a child, but nothing had worked; and that Paternal Grandmother had ongoing issues with methamphetamine, cocaine, marijuana, and medication and that was the reason for his divorce from her.

Due to the lack of a relative placement, the Department placed the children together in a foster home.

## D. Trial Testimony

## 1. Mother's Testimony[17]

Prior to Amy's birth, Father and Mother lived in an apartment and owned a car. Mother testified that she and Father both lost their jobs, then their vehicle, and then their home and that "it's been a battle ever since." Mother testified that they had been living on the streets since Amy was about eight or nine months old and that Amy was three years old at the time of the termination trial.

Mother testified regarding where they had stayed during their homelessness. Mother said that they had stayed at Union Gospel Mission from 2011 to 2012, which included the time while she was pregnant with Jack. After Mother gave birth to Jack, they went as a family to the Salvation Army and were told that they could not stay there because Jack was too little. Mother testified that the family had been living in River Oaks in their vehicle or in a motel since 2012. Mother explained that they had camped out with the children for one night behind a bar that had been condemned; that they had food, drinks, clothing, blankets, and diapers; and that they had the ability to clean the children and bathe them at a friend's house. Mother said that a friend had kept the children one night.

Mother testified that she had taken Jack to the doctor, that his primary care doctor is at John Peter Smith Hospital, and that she had also taken him to Dr.

---

[17]Father appeared but did not testify at trial.

Levy off of Jacksboro Highway. Mother testified that both children had been seen at Cook Children's Hospital and that Amy had been seen for her wellness checkups.[18]

On July 23, 2013, when Howlett met with Mother and Father at the car wash,[19] the children were with Paternal Grandmother at Maternal Grandmother's house. Mother said that the children were not wearing shoes when they arrived at the car wash on July 23 because Maternal Grandmother said that the children had just awakened from their naps; their shoes were in the car. Mother said that the allegations from family members that the children were dirty were not true. Mother said that she does not talk to her family and that Father talks only to Paternal Grandmother and his sister.

Mother did not know on July 23, 2013, that Maternal Grandmother had recently smoked methamphetamine when Mother allowed her access to the children, but Mother was aware that Maternal Grandmother had a history of abusing methamphetamine. Mother testified that it concerned her when she heard that Maternal Grandmother had recently used methamphetamine, but she

---

[18]The "Child's Service Plan" for Jack noted, "Parents also indicate that he has not had any immunizations since birth due to missed appointments," and that the doctor who saw him a week after the removal noted that he was slightly underweight.

[19]Mother testified that she did not stay at the Presbyterian Night Shelter in July 2013 because they did not allow children. Mother testified that she understood that it would be a concern for her children to be outside for an entire day in the summer heat because of the possibility of dehydration. Mother explained that the shelter would put them out all day long, too.

testified that the children were also with Paternal Grandmother and Maternal Aunt. Mother did not know that Maternal Grandmother had used marijuana while the children were in her care.

Mother testified that she had received the service plan on July 24, 2013, and that her caseworker at that time went over it with her. Mother testified that she was familiar with her service plan and that it required her to attend parenting classes, counseling, and domestic violence classes and to complete a psychiatric evaluation and a drug evaluation.[20] Mother testified that her current caseworker had explained to her the importance of completing her service plan.

Mother testified that after the children were removed, she became pregnant and miscarried. Mother said that the miscarriage set her back on her compliance with her service plan.

Mother testified that she had not completed parenting classes. Mother initially blamed her failure to complete her parenting classes on not having transportation. Mother then said that she had only one parenting class left to take but that she was required to start over with her classes due to being tardy to a class. She explained that her visits were from 9 to 10 a.m.; that the parenting class started at 10 a.m.; and that because she was one minute late to a

---

[20]The record reveals that the service plan also required Father and Mother to maintain steady and legal employment and to provide proof of employment via paycheck stubs by the fifth of every month; to maintain safe, stable, and appropriate housing; and to refrain from involvement in criminal activities and illegal acts.

parenting class, they required her to start all over. On cross-examination, Mother admitted that her visitation was changed to enable her to arrive on time for her parenting classes and that she knew the parenting class's attendance policy from the beginning. Mother later clarified that she had transportation to get to her parenting classes.

Mother testified that she had not completed counseling. Mother said that she had only three sessions of individual counseling left but that she had missed one session due to her health and was required to start all over, so she lost three months' worth of classes. Mother said that her caseworker told her to talk to her counselor about whether she could pick up where she had left off instead of starting over.

Mother testified that she was required to attend four domestic violence classes but that she did not understand why she needed to attend domestic violence classes because there had never been abuse between her and Father and she did not even know where to go for the classes. Mother later admitted that her service plan dated September 2013 had specified that she was to attend domestic violence classes at Ben Avenue and that her service plan had not been changed. Mother said that some of her caseworkers had told her that she needed to go to the domestic violence classes and that some of her caseworkers had told her that she did not need to go. Mother admitted that she chose to ignore the caseworkers who had recommended that she attend the domestic

violence classes even though she knew it might be safer for her and for her children.

Mother testified that she had completed the psychiatric evaluation and that it was on file at JPS Hospital. During the psychiatric evaluation, Mother was diagnosed with depression. She was not taking medication for depression at the time of the termination trial because she felt "a lot better being [herself], not on medication." Mother testified that she had previously taken the depression medication and that it made her sleepy. Mother agreed that she was making a decision as to what she wanted to do and what was safest for her and her children. But Mother admitted that it would be in her best interest to follow the doctor's recommendations.

Mother testified that she had never used methamphetamine, that she had "never had any drug use," and that drugs and alcohol have never been an issue for her. Mother testified that she had taken "[q]uite a few" drug tests for CPS and that she had "never been dirty for any of them." Mother said that her last drug test was a hair follicle test and that it came back negative. Mother agreed that she had tested positive once for opiates but explained that she had a prescription. Mother testified that she did not complete the drug evaluation; Mother had talked to the people at Recovery Resources, and her understanding of their requirements to attend their classes was that a person had used drugs within the previous thirty days. Mother said that she had asked but that no one

had been able to answer her about why she was required to complete a drug and alcohol assessment after testing negative for drugs on all of her drug screens.

Mother agreed that her service plan required her not to engage in any criminal activity. Mother admitted that she had been arrested during the course of the case[21] and that she had told Gale Davis.[22]

Mother testified that neither she nor Father has a driver's license. Mother testified that they had received bus passes twice during the case.

Mother has a high school diploma but no college education. When asked whether she was working, Mother said, "No. Well, Pacesetter's Temporary Service." Mother said that she makes $50 per day cleaning different event venues through Pacesetter. Mother said that Father was also working for Pacesetter and that most of the jobs are for men. Mother testified that she and Father had provided check stubs to their previous caseworker. Mother testified that the children were on food stamps, WIC, and Medicaid but that she no longer received that assistance. Mother said that she had sought assistance from Maternal Grandfather and his wife but that they had not provided her with any assistance.

---

[21]An indictment and the police report for Mother's offense of forgery of a check from February 27, 2014, were offered but not admitted into evidence.

[22]Gale Davis was one of the caseworkers who worked on this case; Mother said that they had five caseworkers and two investigators during the case. Mother later explained that she had been involved in seven CPS cases since September 2011.

Mother testified that her service plan required her to attend scheduled visitations and that she had attended the visits. Mother said that when she went to the visits, the children wanted to come home. Mother said that at the last visit, Amy had squeezed Father and had said that she was scared, that she did not want to leave, and that she wanted Father with her. Mother testified that Amy said "all the time" that she wanted to come home and that Jack had recently clenched Mother and said, "Mommy, go home." Mother said that she and Father had taken food and activities to every visit and that they had taken clothing and shoes for the children.

Mother said that the children had been sick most of the time since they had been in foster care and that Jack had just gotten over hand, foot, and mouth disease.[23] Mother said that Jack also had a "big old bruise on his arm" at the last visit and that every time she asked questions, no one knew what had happened but blamed day care.

Mother testified that Escajeda and CPS did not give her any help with finding housing. Mother said that she had called Fort Worth Housing but was told that there was a four-year waiting list. Mother said that she had not been able to sign a lease or to find an apartment; at the time of the termination trial, she still needed to stay in a shelter or with family. Mother testified that she needed a little bit more time to complete her service plan.

---

[23]The children's sicknesses were investigated and attributed to being exposed to a lot of other children at daycare.

Mother testified that Maternal Grandmother's home has two bedrooms and two bathrooms. Mother testified that there were three dogs at Maternal Grandmother's home, that the smell of urine in the home had not been addressed, but that she did not think that it smelled like urine in Maternal Grandmother's home. Mother said that Maternal Grandmother's home had been cleaned up to remove the clutter.

Mother said that she and Father had planned to move to Arkansas on July 26, 2013. Mother testified, "We had everything going for us. We had a home to go to. My husband had a job. But y'all took the children two days before we had a chance to leave, and I was not going to go somewhere where my children are not." She said that Paternal Grandmother had moved to Arkansas at the time of the termination trial.

Mother testified that at the time of the termination trial she and Father were residing at the Presbyterian Night Shelter and the Salvation Army and that they stayed with Maternal Grandmother in Springtown on Tuesday nights because Maternal Grandmother provided transportation to them, taking them to their visits on Wednesdays. After the visits, they stayed in Haltom City close to Pacesetter so that they could get back and forth to work. Mother explained that it was easier for them to stay closer to Haltom City so that they could get up and be at Pacesetter as close to 5 a.m. as possible; she said the sooner they arrived, the better chance they had to get work.

Mother testified that if the children were returned to her, she would take them to the Presbyterian Night Shelter[24] or to Union Gospel Mission. Mother had spoken with Presbyterian Night Shelter about arrangements for bringing the children there. Mother said that Union Gospel Mission had helped with daycare, but she was not sure about Presbyterian Night Shelter. Mother testified that as soon as the case was over, she and Father wanted to move with the children to Arkansas or Washington, where Paternal Grandfather lives. Mother testified that Father had a job in Washington and that she planned to obtain a job.

### 2. Mother's Counselor's Testimony

Vanessa Moreno-Luper, who conducted individual counseling with Mother at Merit Family Services, testified that she met with Mother seven times. Moreno-Luper was authorized to see Mother twelve times from August 19, 2013 to December 31, 2013 and another twelve times from January 1, 2014 to March 31, 2014.

Moreno-Luper completed an assessment with Mother, who reported that she began using cannabis at age fourteen, that she began using methamphetamine at age sixteen but did not let it control her because she had seen what it had done to other people, that she had used alcohol on occasion since age nineteen, and that she had been drug free for four to five years.

---

[24]Mother testified that she could take her children to the Presbyterian Night Shelter after the trial because they now have a facility for families.

Mother's treatment plan included looking at her substance abuse history, communication/relationship issues, and parenting issues.

Moreno-Luper testified that "[p]er the initial presenting problem, I have -- it was determined that client's bio mom, spouse, and mother-in-law were positive for illegal substances." It concerned Moreno-Luper that Mother had continued to use Paternal Grandmother and Maternal Grandmother as support if they had a history of drug abuse.

Moreno-Luper testified that Mother had reported that she and Father had been homeless for over a year due to job loss and that the children spent most of their time living with Paternal Grandmother, where Mother also spent most of her time. Mother admitted that the children were also homeless during this time, and Moreno-Luper discussed with Mother the need to establish and maintain safe, stable housing; employment; and financial stability. Moreno-Luper recommended that Mother complete everything per her service plan.

Mother did not show up for her counseling session on January 29, 2014.

On February 26, 2014, Mother told Moreno-Luper that she had not had anything to eat. Moreno-Luper gave Mother information about local area shelters and food banks and urged Mother to speak to her caseworker about obtaining resources. Moreno-Luper made a phone call and told Mother that as soon as she arrived at the Salvation Army, she would receive a meal.

Mother had a counseling session scheduled for March 12, 2014, but she did not show. Moreno-Luper testified that Mother had not made contact with her

since February 26, 2014, and that she had not discharged Mother from counseling.

When asked whether the children should go home with Mother, Moreno-Luper responded, "Well, due to her instability, where would the children go?" Moreno-Luper based her response on Mother's living situation at the time of their last session on February 26, 2014; Moreno-Luper was not aware of Mother's living arrangements at the time of the termination on June 9, 2014.

### 3. Conservatorship Worker's Testimony

Sherice Hogan, a conservatorship worker with the Department, testified that she was assigned to the case in May 2014, which was a month before the termination trial. Hogan observed the parent-child visits on May 7 and May 14 and did not hear the children express a desire to go home but said that she was not always present to see the entire visit. Hogan testified that the parents were engaged with the children during the visits she had observed. Hogan could not recall whether one or both of the children cried when they left the visit, but she noted that the children hugged Father and Mother.

On May 21, Hogan went over Father's and Mother's service plans with them and told them that their service authorizations had been renewed, that they could begin services again, and that appointments could be made.[25] Hogan

---

[25]Hogan explained that the authorization for Father's and Mother's services had reached an end point after they had stopped working their services. When Hogan met with them, she reiterated that the services were still available to them.

asked Father and Mother where they were living, and they said that they were alternating between shelters and the street. Hogan asked them about employment and requested pay stub copies, but she did not receive any the following time that she saw them.[26]

On June 4, Hogan again requested pay stub copies and inquired about Father's and Mother's living arrangements; they said that they were alternating between shelters and Maternal Grandmother's home.[27] Hogan discussed the Merit counseling with Father and Mother because they were concerned about having to start over. Hogan advised them to contact the provider. Hogan said that Mother asked her about having to attend domestic violence classes; Hogan told Mother that she had signed a copy of her service plan and that she should talk to her attorney and the provider.

Hogan testified that Father and Mother had not completed a drug and alcohol assessment with Recovery Resource; they told Hogan that they did not need to complete the assessment because they had not recently had a positive drug test and that the agency would therefore not treat them. Hogan explained that a drug and alcohol assessment would evaluate whether Father and Mother needed services regarding drug treatment and that the treatment could range

---

[26]Hogan testified that the CPS record included five pay stubs—four from Father and one from Mother. The last pay stub for Father was dated March 25, 2014, and the last pay stub for Mother was dated April 3, 2014.

[27]Hogan testified that she had not had the opportunity to visit Maternal Grandmother's home.

from classes about staying sober to inpatient treatment. Hogan testified that she had not given Father and Mother any drug tests because when Hogan took over the case, the parents had recently been tested for drugs and had tested negative.

Hogan testified that Father and Mother had not completed the parenting classes.

Hogan testified that the Department was concerned about the parents' ability to provide shelter because there was no evidence of stable housing that would last. Hogan testified that the housing instability posed a danger to the children because they were two and three years old and were unable to protect themselves and unable to care for themselves.[28]

Hogan testified that she had met with the children twice and that they appeared to be doing very well in their foster placement; they were happy and had adjusted.

### 4. Ad Litem's Testimony

The children's ad litem testified that she had visited the children on a number of occasions in their foster home and had observed a visit. The ad litem did not see that the children were bonded with the parents during the visit. The ad litem explained that the children interacted with Father and Mother, but the ad

---

[28]The family service plan dated August 6, 2013, noted that "[t]he family does not have a stable home and often sleeps outside. The children are exposed to unknown persons while living in an uncontrolled environment."

litem did not see any evidence of true bonding. The ad litem did not see the children crying when they left the visit.

The ad litem said that the children were doing "great" in their foster home. During the ad litem's visits to the foster home, she noted that both children were happy and that Amy laughed frequently. The ad litem testified that Amy's speech had improved "tremendously."

The ad litem recommended that the children not be returned to Father and Mother. The ad litem pointed out that neither parent has a driver's license and that they were still living on the streets off and on and had not secured a permanent place to live since Jack was born. The ad litem said that there was no evidence that the parents' plan to move to Arkansas with the children would be a better situation. The ad litem testified that there were also issues with illegal drugs and that she was not sure whether Mother had abused hydrocodone off and on.

### 5. Other Evidence in the Record[29]

The record contains a report from the CASA volunteer. During the home visits, Amy was happy, outgoing, and confident. Amy referred to her foster parents as "Mama" and "Daddy" and was affectionate with both. The CASA volunteer noted that Amy's verbal skills had improved since her first meeting with

---

[29]In a bench trial, we may "presume the trial court took judicial notice of its record without any request being made and without any announcement that it has done so." *In re K.F.*, 402 S.W.3d 497, 504 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

Amy in December 2013; the foster parents were concerned that Amy was behind for her age and had worked with her to improve her speech and communication skills. The CASA volunteer noted that Jack was attached to his foster parents and seemed secure and happy in the foster home. He had been diagnosed with asthma and had tubes placed in his ears but was doing well. Jack had gained weight and seemed well adjusted. He enjoyed playing outside and objected loudly when pulled away to go inside.

There were no other children in the foster home. The foster parents hoped to adopt Amy and Jack and had relatives who were supportive and who were engaged in the children's lives.

The CASA volunteer's report stated that Mother appeared to love and miss her children. The CASA volunteer had observed a supervised visit and saw that Mother was engaged with both children and eager to parent them, taking Amy to the restroom and changing Jack's diaper. The CASA volunteer noted that Mother and the children were physically affectionate. Mother always brought an abundance of food to the visits, though the CASA volunteer noticed that Mother was exceptionally thin and frail looking. The children were happy during the visits, but there was no crying or drama when it was time for them to leave.

The CASA volunteer's report noted that Father had also been present at the visits but often appeared sleepy. Father played with each child when they approached him, but he was less engaged than Mother. Father had a criminal case pending, but Father's attorney did not give permission for the CASA

volunteer to speak to him. In January 2014, Father shared that he had a job but that the owner could not pay him.

## 6. Recommendations

The Department requested that the trial court terminate Father's and Mother's parental rights to the children because Father and Mother had failed to acknowledge the circumstances that led to the children's removal and had not engaged in services to address those circumstances. Hogan stated, "All the circumstances that were present at the beginning of the case are still present, all the concerns from the investigation." Hogan testified that she had considered what was in Amy's and Jack's best interest in making the decision to terminate, including the children's need for stability, food, and resources that would help them develop correctly.

The ad litem recommended the termination of Father's and Mother's parental rights.

The CASA volunteer recommended in her report that it was in the best interest of the children for the trial court to terminate Father's and Mother's parental rights to both children, for the trial court to appoint the Department as permanent managing conservator of both children, and for the children to continue to reside in their foster home pending adoption.

Mother asked the trial court not to terminate her parental rights to the children because "[t]he children need us just as much as we need them, and we've tried to do everything we can. We're trying everything we can."

## E. Trial Court's Disposition

After hearing the testimony set forth above, the trial court found by clear and convincing evidence that Father and Mother had knowingly placed or had knowingly allowed the children to remain in conditions or surroundings that had endangered the children's emotional or physical well-being, that Father and Mother had engaged in conduct or had knowingly placed the children with persons who had engaged in conduct that had endangered the children's emotional or physical well-being, and that termination of the parent-child relationship between Father and the children and between Mother and the children was in the children's best interest. The trial court thereafter ordered the termination of the parent-child relationship between Father and the children and between Mother and the children. Father and Mother each perfected an appeal from the trial court's termination order.

## III. BURDEN OF PROOF AND STANDARDS OF REVIEW

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92

(1982)).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence.  Tex. Fam. Code Ann. §§ 161.001, .206(a); *E.N.C.*, 384 S.W.3d at 802. "[C]onjecture is not enough."  *E.N.C.*, 384 S.W.3d at 810.  Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'"  *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(1) and that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001; *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd*, 727

S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## A. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). In this case, Father and Mother challenge the endangering-environment and endangering-conduct findings. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).

We review all the evidence in the light most favorable to the finding and judgment. *J.P.B.*, 180 S.W.3d at 573. We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* "A lack of evidence does not constitute clear and convincing evidence." *E.N.C.*, 384 S.W.3d at 808.

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573, 574. And even when credibility issues appear in the

appellate record, we defer to the factfinder's determinations as long as they are not unreasonable.  *Id.* at 573.

### B.  Factual Sufficiency

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own.  *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated section 161.001(1)(D) or (E) and that termination of the parent-child relationship would be in the best interest of the child.  Tex. Fam. Code Ann. § 161.001(1)(D)–(E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).  If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.  *H.R.M.*, 209 S.W.3d at 108.

### IV. SUFFICIENCY OF EVIDENCE TO SUPPORT ENDANGERING-ENVIRONMENT AND ENDANGERING-CONDUCT FINDINGS

In their first and second issues, both Father and Mother argue that the evidence is legally and factually insufficient to support the section 161.001(1)(D) and (E) endangerment findings.

### A.  Law on Endangerment

"Endanger" means to expose to loss or injury, to jeopardize.  *Boyd*, 727 at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.).

Under section 161.001(1)(D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. When termination of parental rights is based on subsection (D), the endangerment analysis focuses on the evidence of the child's physical environment, but the environment produced by the conduct of the parents bears on the determination of whether the child's surroundings threaten his well-being. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions in subsection (D). *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *12 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.).

Under section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the child's well-being may be inferred from parental misconduct standing alone, and to determine whether termination is necessary, courts may look to parental conduct both before and after the child's birth. *Boyd*,

727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).

Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct that will support an affirmative finding that the parent has engaged in a course of conduct that has the effect of endangering the child. *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.).

Even though imprisonment standing alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a factor that we may properly consider on the issue of endangerment. *E.N.C.*, 384 S.W.3d at 805; *Boyd*, 727 S.W.2d at 533–34; *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.). The Department is not required to show that incarceration was a result of a course of conduct endangering the child; it must show only that incarceration was part of such a course of conduct. *Boyd*, 727 S.W.2d at 533–34; *M.R.*, 243 S.W.3d at 819.

As part of the endangering conduct analysis, a court may consider a parent's failure to complete a service plan. *See In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.). A parent's ability to provide financially for her children is also a factor that may be considered under subsection (E). *See In re M.N.G.*, 147 S.W.3d 521, 538–39 (Tex. App.—Fort Worth 2004, pet. denied).

As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). A

factfinder may infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re M.M.*, No. 02-08-00029-CV, 2008 WL 5195353, at *6 (Tex. App.—Fort Worth Dec. 11, 2008, no pet.) (mem. op.). Further, "evidence of improved conduct, especially of short-duration, does not conclusively negate the probative value of a long history of drug use and irresponsible choices." *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Because the evidence pertaining to subsections 161.001(1)(D) and (E) is interrelated, we conduct a consolidated review. *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.); *J.T.G.*, 121 S.W.3d at 126.

### B. Sufficient Evidence of Endangerment to Support Grounds Challenged by Father

Father argues that his living conditions are a result of poverty and the lack of sufficient income, which is not a sufficient ground for termination. Father also argues that there was no evidence that Maternal Grandmother's home posed a real threat of injury or harm to the children's physical or emotional well-being; that the children's needs were taken care of—they had food, clothing, and diapers and had been taken to doctors and wellness visits; and that Father's one positive drug test does not establish a conscious course of conduct.

Father relies on *Ybarra v. Tex. Dep't of Human Servs.*, for the proposition that poverty or lack of sufficient income is not a sufficient ground for termination. 869 S.W.2d 574, 578–80 (Tex. App.—Corpus Christi 1993, no writ). In *Ybarra*,

CPS removed the children and sought to terminate the mother's parental rights because after the Department had helped move the family into public housing, (1) the children, who were ages ten to two, were found alone one time while the mother was working; (2) the children were hungry and dirty; and (3) there were not enough beds for them. *Id.* at 577–78. There was no evidence of the conditions' effects on the children. *Id.*

In the present case, the testimony at trial emphasized the children's young ages and how the clutter in Maternal Grandmother's house could have fallen on the children when they stayed there, but the main emphasis was that the family's housing instability—constantly moving from the shelters to the streets to motels and back to the streets—posed a danger to the children who were unable to protect themselves and unable to care for themselves. While we agree that parental rights may not be terminated simply because a parent is poor, the record here reveals that it was not poverty that led to the termination of Father's parental rights but rather Father's failure to take advantage of homeless resources. During Father's homelessness, he refused to stay in shelters for any length of time and constantly moved the children from place to place, did not keep in contact with the Department to obtain services, exposed his children to environments where known drug users were present, and subjected his children to sleeping on pallets behind an abandoned bar and to panhandling on the

highway in the heat of summer.[30] *See S.D.*, 980 S.W.2d at 763 (stating that conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being).

Although the record establishes that the children did not appear to be malnourished on the occasions when they were seen by the Department's investigators and caseworkers, the record also contains evidence of neglect. The record reveals that Amy had asked patrons of the convenience store for food; that Amy was allowed to walk around in the car wash without shoes on, despite that the car wash was not clean; and that Jack had not been taken for any well-baby checkups to obtain his immunizations. *See Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000,

---

[30]Within his argument challenging the endangering environment finding, Father notes that CPS was involved with the family for over two years before it initiated a nonemergency removal and that CPS left the children with Maternal Grandmother on July 23, 2013—the night before the removal—despite that she had tested positive for methamphetamine and amphetamines. To the extent that Father complains that CPS should have initiated a removal earlier because CPS was familiar with the family's living situation, the record is replete with evidence that the family's nomadic lifestyle made it difficult for CPS to initiate a court case because the family could not be found to be served. To the extent that Father argues that CPS also left the children with a drug user, the statute focuses on the conduct of the parents, and the record reveals that Maternal Grandmother had smoked marijuana the previous night, which is when Father had left the children with her. *See generally* Tex. Fam. Code Ann. § 161.001. Moreover, there was no evidence that Maternal Grandmother was under the influence on July 23, 2013, when CPS allowed the children to go home with her and Paternal Grandmother, who was staying with Maternal Grandmother and had tested negative for all substances on July 23.

pet. denied) (stating that a parent's rights can be terminated based on poverty when there is a showing that the poverty has endangered the child).

With regard to Father's argument that one positive drug test does not establish a conscious course of conduct, the "course of conduct" language that Father uses is not found in the statutory grounds for termination listed in section 161.001(1)(D) or (E).  *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E).  Instead, the "course of conduct" language appears to come from *Boyd*, which dealt with whether a parent's imprisonment could constitute evidence of endangering conduct under former Texas Family Code section 15.02(1)(E).  727 S.W.2d at 534.[31]  To the extent that case law requires a "course of conduct," the factfinder was free to believe—based on numerous reports of Father's drug use and intoxication throughout the three years that the Department was involved with the family, as well as Father's own admission that he had smoked marijuana after Amy was born—that Father had used drugs on more than one occasion.  *See S.N.*, 272 S.W.3d at 52 (stating that evidence of illegal drug use or alcohol abuse by parent will support endangering-conduct finding).  Moreover, Father does not challenge the evidence that he had frequently left the children with known drug users; that he had been arrested for theft and burglary in Kansas, that he had

---

[31]The "course of conduct" language appears to have originated in *H.W.J. v. State Department of Public Welfare*, 543 S.W.2d 9, 10–11 (Tex. Civ. App.—Texarkana 1976, no writ).  *H.W.J.*, like *Boyd*, looked at terminating a parent's parental rights when the parent's persistent criminality, which did not directly endanger the child, led to protracted incarceration.  543 S.W.2d at 10–11.

gone to jail twice in the two months preceding the children's removal, and that he had warrants for his arrest at the time the children were removed; and that he had failed to complete his services—all of which can be considered in an endangering-environment analysis and an endangering-conduct analysis under subsections (D) and (E). *See E.N.C.*, 384 S.W.3d at 805; *Boyd*, 727 S.W.2d at 533–34; *K.C.F.*, 2014 WL 2538624, at *12; *R.F.*, 115 S.W.3d at 811.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold (1) that there is some evidence of endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Father had knowingly placed or had knowingly allowed Amy and Jack to remain in conditions or surroundings that had endangered Amy's and Jack's emotional or physical well-being and (2) that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Father had engaged in conduct or had knowingly placed Amy and Jack with persons who had engaged in conduct that had endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *In re A.H.*, No. 02-12-00096-CV, 2012 WL 4450490, at *7–8 (Tex. App.—Fort Worth Sept. 27, 2012, no pet.) (mem. op.) (holding evidence legally sufficient to support trial court's section 161.001(1)(E) finding because mother's drug use, unstable work and housing history, decisions to leave her children with known drug users, and history of criminal violations and

incarcerations affected her ability to provide a stable living environment for child); *T.N.S.*, 230 S.W.3d at 439 (holding evidence legally sufficient under subsections (D) and (E) due to parent's drug use, incarceration, and instability).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm conviction or belief that Father had knowingly placed or had knowingly allowed Amy and Jack to remain in conditions or surroundings that had endangered Amy's and Jack's emotional or physical well-being and that Father had engaged in conduct or had knowingly placed Amy and Jack with persons who had engaged in conduct that had endangered their physical or emotional well-being. *See A.H.,* 2012 WL 4450490, at *7–8 (holding evidence factually sufficient to support trial court's section 161.001(1)(E) finding because mother's drug use, unstable work and housing history, decisions to leave her children with known drug users, and history of criminal violations and incarcerations affected her ability to provide a stable living environment for child); *T.N.S.*, 230 S.W.3d at 439 (holding evidence factually sufficient under subsections (D) and (E) due to parent's drug use, incarceration, and instability).

We overrule Father's first and second issues.

### C. Sufficient Evidence of Endangerment to Support Grounds Challenged by Mother

Mother argues that the evidence presented at trial did not demonstrate any act or omission on her part that could be reasonably construed as endangerment. Mother further argues that there was an absence of evidence regarding the effect of the family's extended period of homelessness on the children; that Mother did not know that Maternal Grandmother was using methamphetamine while caring for the children; that the children appeared to be healthy and clean and did not appear to be malnourished; and that Mother had engaged in her services and had made significant progress in completing them.

As discussed above in analyzing the sufficiency of the evidence to support the endangerment findings related to Father, there was testimony from Howlett that the family's housing instability posed a danger to the children who were unable to protect themselves and unable to care for themselves. The record here reveals that during Mother's homelessness, she refused to stay in shelters for any length of time and constantly moved the children from place to place, did not keep in contact with the Department to obtain services, exposed her children to environments where known drug users were present, and subjected her children to sleeping on pallets behind an abandoned bar and to panhandling on the highway in the heat of summer. *See S.D.*, 980 S.W.2d at 763 (stating that conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being).

With regard to Mother's argument that she did not know that Maternal Grandmother was using methamphetamine while caring for the children,[32] the record reveals that Maternal Grandmother used marijuana while she was caring for the children on July 21, 2013, and that she had used methamphetamine a few days prior. Although Mother told Howlett on July 22 that she was not sure whether Maternal Grandmother was currently clean because she was not around Maternal Grandmother that much, Father and Mother had told Howlett at the car wash that the children were usually with Maternal Grandmother—the only one who had consistent housing—because it was so hot. Moreover, the record reflects that Mother was aware that Maternal Grandmother had a history of abusing methamphetamine. *See K.C.F.*, 2014 WL 2538624, at *12 (stating that a parent's decision to leave a child in the care of a known drug user is relevant to the predicate acts or omissions in subsection (D)).

Although the record establishes that the children did not appear to be dirty or malnourished on the occasions when they were seen by the Department's

---

[32]Within her argument challenging the endangerment findings, Mother argues that the CPS investigator "demonstrated that she was not concerned with the maternal grandmother's ongoing drug use by allowing the maternal grandmother to take the children home with her after testing positive for methamphetamine use." As explained above, the statute focuses on the conduct of the parents, and the record reveals that Maternal Grandmother had smoked marijuana the previous night, which is when Mother had left the children with her. *See generally* Tex. Fam. Code Ann. § 161.001. Moreover, there was no evidence that Maternal Grandmother was under the influence on July 23, 2013, when CPS allowed the children to go home with her and Paternal Grandmother, who was staying with Maternal Grandmother and had tested negative for all substances on July 23.

investigators and caseworkers, the record also contains evidence that the children were not always properly cared for. The record reveals that Amy had asked patrons of the convenience store for food; that Amy was allowed to walk around in the car wash without shoes on, despite that the car wash was not clean; and that Jack had not been taken for any well-baby checkups to obtain his immunizations. *See Doyle*, 16 S.W.3d at 398 (stating that a parent's rights can be terminated based on poverty when there is a showing that the poverty has endangered the child).

With regard to Mother's argument that she had engaged in her services and had made significant progress in completing them, the record reveals that Mother had completed only her psychiatric evaluation and that she had regularly attended visits. Although she had attended seven counseling sessions, she had not completed the twelve that she had been allotted and had not been discharged from counseling. Mother also failed to complete her parenting classes; to maintain steady and legal employment and to provide proof of employment via paycheck stubs by the fifth of every month; to maintain safe, stable, and appropriate housing; and to refrain from involvement in criminal activities and illegal acts. Mother thus did not successfully complete her services. *See R.F.*, 115 S.W.3d at 811 (allowing court to consider a parent's failure to complete a service plan as part of the endangering conduct analysis).

In addition to the above evidence that Mother left the children with known drug users in July 2013, the record further demonstrates that Mother had

endangered Amy shortly after she was born by leaving her with known drug users so that Mother could smoke marijuana with friends and that Mother had been arrested for theft and forgery and had warrants for unpaid tickets at the time the children were removed—all of which have been shown to constitute endangering conduct under subsection (E). *See E.N.C.*, 384 S.W.3d at 805; *Boyd*, 727 S.W.2d at 533–34; *S.N.*, 272 S.W.3d at 52.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold (1) that there is some evidence of endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed Amy and Jack to remain in conditions or surroundings that had endangered Amy's and Jack's emotional or physical well-being and (2) that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct or had knowingly placed Amy and Jack with persons who had engaged in conduct that had endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E); *A.H.*, 2012 WL 4450490, at *7–8; *T.N.S.*, 230 S.W.3d at 439.

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could

reasonably form a firm conviction or belief that Mother had knowingly placed or had knowingly allowed Amy and Jack to remain in conditions or surroundings that had endangered Amy's and Jack's emotional or physical well-being and that Mother had engaged in conduct or had knowingly placed Amy and Jack with persons who had engaged in conduct that had endangered their physical or emotional well-being. *See A.H.*, 2012 WL 4450490, at *7–8; *T.N.S.*, 230 S.W.3d at 439.

We overrule Mother's first and second issues.

## V. BEST-INTEREST FINDING

In his third issue, Father argues that the evidence is legally and factually insufficient to support the section 161.001(2) finding that termination of the parent-child relationship between Father and the children is in the children's best interest. In her third issue, Mother argues that the evidence is factually insufficient to support the section 161.001(2) finding that termination of the parent-child relationship between Mother and the children is in the children's best interest.

### A. Presumption and *Holley Factors*

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2014).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *C.H.*, 89 S.W.3d at 28; *see E.C.R.*, 402 S.W.3d at 249. Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include the following:

(A)   the desires of the child;

(B)   the emotional and physical needs of the child now and in the future;

(C)   the emotional and physical danger to the child now and in the future;

(D)   the parental abilities of the individuals seeking custody;

(E)   the programs available to assist these individuals to promote the best interest of the child;

(F)   the plans for the child by these individuals or by the agency seeking custody;

(G)   the stability of the home or proposed placement;

(H)   the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)   any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of

just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### B. Analysis of Evidence Under the *Holley* Factors[33]

With regard to the desires of the children, neither child testified at the termination trial. At the time of the termination trial, Amy was three years old, and Jack was twenty-one months old. Mother testified that the children had told her at the visits that they wanted to come home. No one else heard the children mention this; the ad litem testified and the CASA volunteer reported that the children did not cry when they left visits. Although there was evidence that Mother and the children were physically affectionate during visits, there was also evidence that the children were not bonded with Father and Mother, that Amy referred to her foster parents as "Mama" and "Daddy," that Jack was attached to his foster parents and seemed secure and happy in the foster home, and that the children were doing "great" in their foster home. The trial court was entitled to find that this factor weighed in favor of termination of Father's and Mother's parental rights to the children.

---

[33]Because the *Holley* factors focus on the best interest of the children, not the parents individually, we conduct a combined best-interest analysis in disposing of Father's and Mother's third issues.

As for the emotional and physical needs of the children now and in the future, the children's basic needs included food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and activities appropriate to their ages. The record revealed that Amy had begged for food after eating only gummy bears the two days prior, that the children had not been provided stable housing for most of their lives, that Jack had not been taken to any well-baby checkups before he came into the Department's care, and that some of the environments where the family had lived—motels, on pallets behind an abandoned bar, and at a home with known drug users—were not safe. In contrast, the record revealed that all of the children's needs were being met in their foster placement and that the foster parents had worked with Amy to improve her speech and communication skills due to the developmental delays that she had exhibited in her speech. Mother testified that if the children were returned, she would take the children to Presbyterian Night Shelter. But Mother also testified that they planned to move to either Arkansas or Washington, that Father had a job waiting for him in Washington, and that she would seek employment once they moved. Because the record contains no evidence to prove that Father's and Mother's financial and living arrangements would be more stable if the children were returned than what their arrangements had been during the previous three years,[34] the trial court was

---

[34]Father concedes this in his brief, stating that "there was no evidence concerning the stability of either location."

entitled to find that this factor weighed in favor of termination of Father's and Mother's parental rights to the children.

With regard to the emotional and physical danger to the children now and in the future, Hogan testified that the family's housing instability posed a danger to the children because they were two and three years old and were unable to protect themselves and unable to care for themselves. Even with knowledge of Paternal Grandmother's and Maternal Grandmother's previous drug use, Father and Mother entrusted the children to the grandmothers. The trial court was entitled to find that this factor weighed in favor of termination of Father's and Mother's parental rights to the children.

With regard to Father's and Mother's parenting abilities, the record revealed that the parents were engaged with the children during the visits. Mother was noted as being eager to parent the children at visits, taking Amy to the restroom, changing Jack's diaper, and bringing an abundance of food. Father often appeared sleepy and was less engaged than Mother at the visits; he played with the children only when they approached him. The record demonstrated that Father and Mother had smoked marijuana after Amy was born, that Father had tested positive for methamphetamine and amphetamines the day before the children were removed, and that Father and Mother had left the children with known drug users. It appeared to one relative that Father and Mother chose drugs over their children. The record also demonstrated that the children's shelter, food, clothing, and medical needs were neglected by Father

and Mother; that Father and Mother subjected the children to panhandling on the highway in the heat of summer; and that Father and Mother had been arrested several times. The trial court was entitled to find that this factor weighed in favor of termination of Father's and Mother's parental rights to the children.

The record revealed that the Department had attempted to provide FBSS services to Father and Mother on numerous occasions during the two years preceding the removal of the children and that Father and Mother did not stay in contact with the Department to take advantage of those services.[35] The record also demonstrated that Father and Mother did not complete their court-ordered services as part of this case. The trial court was entitled to find that this factor weighed in favor of termination of Father's and Mother's parental rights to the children.

With regard to the plans for the children and the stability of the proposed placement, Mother testified that as soon as the case was over, she and Father wanted to move with the children to Arkansas or Washington, where Paternal Grandfather lives; Mother testified that Father had a job in Washington and that she planned to obtain a job. There was no evidence, only speculation, that the parents' planned move would provide more stability than their current situation. The foster parents hoped to adopt Amy and Jack and had shown the ability to meet all of their needs. The trial court was entitled to find that these two factors

---

[35]The record does not support Father's argument that "CPS did not provide Father with available resources simply because he was homeless."

weighed in favor of termination of Father's and Mother's parental rights to the children.

With regard to the acts or omissions of the parents that may indicate that the existing parent-child relationships are not proper ones, the analysis set forth above—which details Father's and Mother's instability, their inability to meet the children's physical needs due to their instability, and Father's and Mother's poor parenting choices, as well as their failure to take advantage of the services they were offered—reveals that the existing parent-child relationship between Father and the children and between Mother and the children are not proper relationships. The trial court was entitled to find that this factor weighed in favor of termination of Father's and Mother's parental rights to the children.

As for any excuse for the acts or omissions of the parents, Mother testified that she and Father had both lost their jobs, then their vehicle, and then their home and that "it's been a battle ever since." Mother said that the miscarriage set her back on her compliance with her service plan. Mother testified that Escajeda and CPS did not give her any help with finding housing. Although we are not unsympathetic to Father's and Mother's plight, the trial court was entitled to find that this factor weighed in favor of termination of Father's and Mother's parental rights to the children.

Viewing all the evidence in the light most favorable to the best-interest finding and considering the nonexclusive *Holley* factors, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of

the parent-child relationship between Father and the children was in the children's best interest, and we therefore hold the evidence legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan*, 325 S.W.3d at 733 (holding evidence legally sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination).

Similarly, reviewing all the evidence with appropriate deference to the factfinder, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and the children and between Mother and the children was in the children's best interest, and we therefore hold that the evidence is factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(2); *Jordan*, 325 S.W.3d at 733 (holding evidence factually sufficient to support the trial court's finding that termination of mother's parental rights was in child's best interest when most of the best interest factors weighed in favor of termination); *In re S.B.*, 207 S.W.3d 877, 887–88 (Tex. App.—Fort Worth 2006, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with [a] family service plan support a finding that termination is in the best interest of the child.").

We overrule Mother's and Father's third issues.

## VI. Conclusion

Having disposed of Father's three issues and Mother's three issues, we affirm the trial court's judgment terminating the parent-child relationship between Father and Amy and Jack and between Mother and Amy and Jack.


/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

DELIVERED: November 6, 2014