

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00309-CV

_____

IN THE INTEREST OF P.P.-S., AND G.P.-S., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-720044-22

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant G.S.-E. (Mother) appeals the trial court's order terminating her parental rights to her children, P.P.-S. and G.P.-S. Mother argues that the evidence was legally and factually insufficient to support termination under Family Code Subsections 161.001(b)(1)(D), (E), and (O); that the trial court's finding under Section 161.001(d)[1] "was in error"; and that the evidence was legally and factually insufficient to support the trial court's best-interest finding. Because we hold that the evidence is legally and factually sufficient to support the trial court's endangering conduct findings and the best-interest findings, we affirm the trial court's order terminating Mother's parental rights.

## I. Background

On May 12, 2022, the Texas Department of Family and Protective Services (TDFPS) received a report alleging neglectful supervision of the children by Mother. There were concerns that Mother and the children's father (Father)[2] had been physically fighting in front of the children and that Father had moved into the home after being released from prison.

---

[1]The trial court found that Mother did not prove by a preponderance of the evidence that she was unable to comply with specific provisions of a court order or that she made a good-faith effort to comply but that her failure to do so was not her fault. *See* Tex. Fam. Code Ann. § 161.001(d); *see also id.* § 161.001(b)(1)(O).

[2]Father's parental rights to the children were terminated in 2019. He is not a party to this appeal.

## A. TDFPS's Investigation

TDFPS Investigator Mikaila Horton followed up on the neglectful supervision allegations against Mother. On May 13, 2022, Horton spoke with the property manager at the apartment complex where Mother resided; she told Horton that she had received several complaints of nonstop fighting and that Mother was on the verge of eviction. When Horton spoke with Mother, Mother denied that Father had been staying in the home with the children. Horton then spoke to the children, and they relayed that their "daddy" had been staying with them. The property manager later confirmed that she had seen Father and that he had been staying with Mother. While Mother continued to deny that Father had been living with her, Horton advised Mother to contact law enforcement and request a protective order if Father came to the residence again.

Horton also spoke with an employee at the children's school who stated that the children had been frequently absent. She told Horton that an unknown man had been dropping the children off and that she felt that Mother had not been "keeping up with" the children.

On June 22, 2022, TDFPS Investigator Nicole Rosier spoke with staff at the leasing office of Mother's residence. A staff member relayed that there had been another incident of fighting between Mother and the man living with her and that Mother had received an eviction notice because of the continued fighting. Mother's neighbor told Rosier that he could hear fights between Mother and the same man and

that he could hear the children crying during the fighting. When Rosier met with Mother, Mother told her that she had tried to get a protective order against Father but that, anytime she called the police, Father would be gone by the time the police arrived at her home. Rosier advised Mother that she should not open the door of her home for Father or otherwise engage with him, and Mother agreed.

Rosier met with the children and tried to ask about Father, but the children were not responsive to her questions. G.P.-S. told Rosier that she had been instructed by someone not to "say things" to Rosier. She did not provide the person's name.

### 1. History of Family Violence in the Home

Father has a history of domestic violence. When P.P.-S. was approximately six months old, Father committed family-violence assault against Mother. He was convicted for that offense in May 2016. On February 10, 2019, and June 11, 2019, Father committed family-violence assaults against Mother. In 2020, he received two felony convictions for family-violence assault with a previous conviction for those offenses.

Mother initially claimed that she had not seen or heard from Father since he was released from prison in April 2022. However, TDFPS's investigation revealed that Mother had allowed Father to stay in her home with the children after he was released from prison. At trial, the property manager testified that when she confronted Mother about the complaints regarding the fighting heard from Mother's home, Mother stated that her "ex" had been staying with her and that they had been

4

fighting in the home. The fighting became so excessive that Mother was threatened with eviction unless she could provide proof of a protective order against Father. Mother agreed but never provided any proof. The property manager observed that while Mother appeared to be concerned about the fighting that had been happening in front of the children, she was "not concerned enough to make [Father] leave" the home. The property manager ultimately decided to let Mother stay, but only because Father had gone back to jail.

Linda Frederickson, the children's counselor, testified that the children's behavior had "[d]eteriorated" by August 2022. The children disclosed to Frederickson that they had witnessed domestic violence in the home. They explained that Mother and Father would "scream and yell at each other" and make each other bleed. The children were afraid in their own home. G.P.-S. explained that she did not feel safe in Mother's home and preferred to live with her foster family. Frederickson observed that P.P.-S.'s behavior began "mimicking" the characteristics of domestic violence. She opined that the children would likely develop "more anxieties and problems" if they were to return to Mother's care.

On June 23, 2022, TDFPS received another intake report alleging neglectful supervision after law enforcement responded to another family-violence incident between Mother and Father that had occurred in front of the children.

### 2. Mother's Drug Use

When Rosier met with Mother on June 23, 2022, Mother denied any recent drug use. Mother's oral swab drug test was negative, but the result from her hair strand test was positive for methamphetamines. Rosier confronted Mother with the drug test results, and Mother admitted that she had been using methamphetamines on the weekends but that she had not used since April 2022. She claimed that she had been "stressed" about Father getting out of prison and finding her. Mother denied that she had ever used methamphetamines while the children were present. To Mother's credit, she did not test positive for illegal drugs after the children were removed from her care.

### 3. Mother's History with TDFPS

In June 2018, TDFPS found "Reason to Believe" on allegations of neglectful supervision of the children by Mother and Father following concerns of domestic violence between Mother and Father and of the family's homelessness. Both Mother and Father tested positive for methamphetamines. At that time, Mother was the children's primary caregiver. Mother and Father were uncooperative and evaded TDFPS throughout the case. The children were removed and placed in foster care. In August 2020, the children were returned to Mother's care after Father's parental rights had been terminated.

## B. Removal

TDFPS sought removal of the children because of Mother's allowing Father to reside in her home and to have continued contact with the children, the history of domestic violence between Mother and Father, Father's criminal history, Mother's being evicted due to several complaints of fighting, Mother's history of drug use, and Mother's TDFPS history resulting in a previous removal of the children. The children were removed from Mother's care in July 2022.

## C. After Removal

As part of Mother's services, Mother was required to stay away from Father. Mother understood that she was not to have any contact with him, though she expressed that she did not understand why Father had anything to do with her family case, as his parental rights had been terminated.

In October 2022, there was another incident of domestic violence between Mother and Father in Mother's home. The police report noted that Father had been paroled to Mother's home. Mother did not disclose the assault to her therapist or to her caseworker. Instead, Mother lied and said that she had not been in contact with Father since the children were removed. Following Father's arrest for the October 2022 assault, Mother told her caseworker that she had heard from her mother-in-law that Father was in jail, but she did not disclose that he had been arrested for the assault. She also lied to her therapist about Father's incarceration, claiming that she had learned of Father's arrest in court and that he was in jail due to a parole violation.

During a January 20, 2023 permanency hearing, the trial court emphasized the requirements of Mother's service plan and cautioned Mother not to have contact with Father. Despite the warning, Mother visited Father in jail that same day. Mother visited Father in jail approximately fifteen times while he was incarcerated for assaulting her, in violation of her service plan. She was dishonest about that contact with Father as well, and when confronted by her caseworker and by her therapist, Mother claimed that she had visited Father only "a couple of times" to discuss their divorce, though she continued to visit him even after the divorce was final.

Mother told her caseworker that, despite Father's parental rights having been terminated, he was still the children's father and had a right to know about his kids. This statement led the caseworker to believe that Mother would not protect the children from Father. She testified that Mother's continuing to see Father was a safety concern indicating that domestic violence was likely to continue.

As part of her service plan, Mother was also required to successfully complete a Family Recovery Court program and individual counseling. Mother was unsuccessfully discharged from the Family Recovery Court program. Mother's therapist reported that Mother had been making progress in individual counseling and that she had wanted to continue working with Mother. However, Mother chose not to continue individual counseling as she felt there was no need for it. Mother's therapist could not "mark" that Mother had been successfully discharged from her individual counseling because she continued to lie to her therapist. While Mother did

successfully complete some of her services, such as a parenting support program, her caseworker testified that Mother could not demonstrate or "put into practice" what she had learned. The caseworker opined that Mother therefore had not successfully accomplished the intended goal of those services.

**D. Foster Placement**

When the children were removed from Mother's care, they were placed with the same foster mother with whom they had been placed during the 2018 removal and with whom they had a continued relationship and support from even after having been returned to Mother's care in 2020. For example, the foster mother provided the children, and even Mother, with basic needs—such as groceries, gas, and clothing—and continued to maintain contact with the children between both TDFPS cases. Mother's caseworker testified that the foster mother had sought out additional services for the children and that she had "advocated for them to ensure that they got every possible service" necessary for their progression. Indeed, the foster mother's efforts helped the children advance their educational level despite having been behind when they went into her care the second time.

G.P.-S. told Frederickson that her foster mother had been taking "good" care of them. Frederickson opined that the children's foster mother, who is adoption motivated, had been working diligently on their behalf and that she appeared to have the ability to help the children develop. Frederickson also described the foster placement as "emotionally and psychologically stable." The CASA (Court-Appointed

Special Advocate) opined that removing the children from their foster placement would be detrimental to the children's mental, emotional, and physical health.

The children began to consider their foster placement "home," and they told the CASA that they felt safe with their foster mother and wanted to stay with her. According to the caseworker, the children even began referring to their foster mother as "mommy." Conversely, the children expressed to Frederickson that they did not want to live with Mother and that they did not feel safe in Mother's home.

## II. Discussion

### A. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination—here, TDFPS—must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences,

10

but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that TDFPS proved the specific grounds for termination under Family Code Subsections 161.001(b)(1)(D) and (E) and that the termination of the parent–child relationship is in the children's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

11

**B. Termination Under Subsections 161.001(b)(1)(D) and (E)**

Mother argues that the evidence is legally and factually insufficient to support termination of her parental rights under Family Code Subsections 161.001(b)(1)(D) and (E). We disagree.

**1. Applicable Law**

Under Subsections (D) and (E), the trial court may terminate a parent's rights if it finds by clear and convincing evidence that the parent has

> (D)  knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

> (E)  engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under Subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The conduct of a parent in the home can create an environment that endangers the child's physical and emotional well-being. *Id.* For example, "abusive or violent conduct by a parent or other resident of a child's home" may produce an endangering environment. *Id.* A

12

parent's choice to continue a romantic relationship with a partner who exposes the child to domestic violence can constitute endangerment under Subsection (D) because such exposure may cause traumatic harm to a child. *In re B.U.*, 02-23-00150-CV, 2023 WL 5967604, at *4 (Tex. App.—Fort Worth Sept. 14, 2023, no pet.) (mem. op.); *In re O.E.R.*, 573 S.W.3d 896, 906 (Tex. App.—El Paso 2019, no pet.). Illegal drug use by the parent "likewise supports the conclusion that the child[]'s surroundings endanger [his or her] physical or emotional well-being." *J.T.G.*, 121 S.W.3d at 125.

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. The endangering conduct need not be directed at the child, nor must the child actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312. The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child."). Illegal drug use and its effect on the parent's life and her ability to parent may establish an endangering course of conduct. *Id.* Evidence that a parent "exposed her children to domestic violence" may also support a finding of endangerment under

13

Subsection (E). *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.).

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of those subsections. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

**2. Analysis**

The record reflects that Mother deliberately exposed the children to domestic violence in the home and that she failed to protect the children from Father's violence. Father has a history of domestic violence. Despite that history, and despite Father's parental rights having previously been terminated, Mother allowed Father to move into her home with the children after he was released from prison. In the home, Mother and Father argued and physically fought "nonstop." The fighting was so excessive that Mother's neighbors made several complaints, and Mother was threatened with eviction if the fighting did not stop. The children witnessed the abuse and had seen their parents bleeding. They told their counselor that they were afraid in their own home.

Mother asserts that she was the victim of Father's violence. While this may be true, Mother took deliberate actions to maintain contact with Father even after the children had been removed from her care and in direct violation of her service plan. *Cf. In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.) (concluding a

14

court may consider a parent's noncompliance with a service plan as part of the endangerment analysis).

According to Mother, Father—who no longer has any parental rights to the children—had a "right to know about his kids." This led the caseworker to believe that Mother would not protect the children from Father, and the evidence suggests that the domestic violence was likely to continue upon Father's release from his most recent incarceration. For example, the children were removed from Mother's care in June 2018 due, in part, to concerns of domestic violence between Mother and Father. During that case, Father continued to collect felony convictions for committing family-violence assault against Mother, and his parental rights were terminated. The children were subsequently returned to Mother's care. During this case, Father committed another family-violence assault against Mother. Yet Mother could not comprehend why Father "had anything to do with" this case, and she was dishonest with her caseworker and her therapist about her contact with Father. *Cf. In re T.J.*, No. 05-22-00954-CV, 2023 WL 1988838, at *9 (Tex. App.—Dallas Feb. 14, 2023, no pet.) (mem. op.) (upholding endangerment finding when mother "failed to cooperate with [TDFPS] and failed to participate in the services she needed to complete in order to preserve her relationship with the children").

Mother was so stressed about Father getting out of prison and finding her that she relapsed and began using methamphetamines again. She claimed that she tried to get a protective order against Father, but she never produced the protective order.

And while she ultimately sought a divorce from Father, she continued to contact him after the divorce was final. Despite knowing that Father was an abusive, violent person, and despite likely being a victim herself, Mother deliberately kept him involved in the children's lives, and she lied about his involvement throughout the case. She apparently was "not concerned enough" about the domestic violence to remove Father from the children's lives.

Viewing all the evidence in the light most favorable to the trial court's judgment and giving due deference to the factfinder's endangerment findings, we hold that a factfinder could reasonably form a firm conviction or belief that Mother had knowingly placed or had knowingly allowed the children to remain in conditions or surroundings that endangered their emotional or physical well-being and that Mother had engaged in conduct or knowingly placed the children with others whose conduct endangered their physical or emotional well-being. *See* Tex. Fam. Code. Ann § 161.001(b)(1)(D), (E). Accordingly, we overrule Mother's issues regarding termination under Subsections (D) and (E). *See id.*

Because a finding of only one predicate ground alleged under Family Code Section 161.001(b)(1) is sufficient to support termination, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we need not reach Mother's issues regarding termination under Subsection 161.001(b)(1)(O).

## C. Best Interest of the Children

Mother challenges the sufficiency of the evidence to support the trial court's determination that termination of Mother's parental rights is in the children's best interest. For the reasons set out below, we overrule this issue.

### 1. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)  the [child's] desires . . . ;

(B)  the [child's] emotional and physical needs[,] . . . now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)    the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)    any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

**2. Analysis**

The following evidence, in context, supports the trial court's finding that termination of the parent–child relationship between Mother and the children was in the children's best interests:

- (First *Holley* factor) The children expressed that they wanted to stay in their foster "home." They felt safe with their foster mother and referred to her as "mommy." Conversely, the children expressed that they did not feel safe in Mother's home and that they did not want to live with Mother.

- (Second and Third *Holley* Factors) The children needed a safe and stable home and a mother who did not allow a violent person into the home. The children also needed a mother that prioritizes "keeping up with" them and ensuring that their

18

needs are met. Mother exposed the children to a pattern of domestic violence; the children were afraid in their own home. The domestic violence in Mother's home created both emotional and physical risks for the children. While in Mother's care, the children missed school, and their behavior "deteriorated." If they were returned to Mother's care, the children would likely develop "more anxieties and problems." Removal from the foster mother's care would risk causing the children more trauma and upsetting their stability.

• (Fourth *Holley* Factor) Mother demonstrated an inability to parent. She prioritized her own desires over the children's safety and stability by remaining involved with her violent, abusive husband and allowing him to live with them. While Mother appeared to be concerned about the domestic violence happening in front of the children, she was "not concerned enough to make [Father] leave." She also felt that Father still had a right to be in the children's lives despite a termination order to the contrary. The children's foster mother, on the other hand, had been working diligently on their behalf. The evidence showed that she, unlike Mother, appeared to have the ability and desire to help the children develop, and she ensured that the children were provided for and felt safe.

• (Fifth *Holley* Factor) Mother failed to take advantage of the programs available to assist her. She was unsuccessfully discharged from the Family Recovery Court program, and her dishonesty with her therapist prevented her from successfully completing individual counseling. She also failed to stay away from Father despite being ordered to do so. While Mother completed some of her services, she did not accomplish the intended goal of those services.

• (Sixth *Holley* Factor) Mother did not suggest any plans for the children. She testified that she intended to continue going to Narcotics Anonymous meetings. Regarding how she planned to protect the children, Mother testified that "[o]nly time could prove that." Other than Mother's commendable plan to keep herself clean from drug use, she wholly failed to identify her legitimate plans for the children. *See In re A.B.*, No. 02-23-00124-CV, 2023 WL 5615870, at *6 (Tex. App.—Fort Worth Aug. 31, 2023, pet. denied) (mem. op.); *In re K.A.*, No. 02-19-00099-CV, 2019 WL 4309168, at *9 (Tex. App.—Fort Worth Sept. 12, 2019, pet. denied) (mem. op.).

• (Seventh *Holley* Factor) Mother did not demonstrate that she could provide the children with permanency and stability. *Cf. In re G.V., III*, 543 S.W.3d 342, 350 (Tex. App.—Fort Worth 2017, pet. denied) ("[C]hildren need permanency and stability."). She asserted that she worked as an Uber driver and that she rented a car to perform her job. But she provided no proof of employment or any car

rental arrangement. On appeal, she offers the conclusory assertion that she "had a home[] and had a job." Conversely, the children's foster mother was able to provide the children with a safe, stable home in which the children were thriving. She also helped Mother provide for the children when they were in Mother's care. The children had a "good" relationship with their foster mother, who expressed that she was adoption motivated. TDFPS had no concerns about whether the foster mother could meet the needs of the children.

- (Eighth and Ninth *Holley* Factors) Mother's acts—maintaining contact with Father and exposing the children to domestic violence—and omissions—failing to shield the children from domestic violence, lying about contacting Father, and noncompliance with her service plan—indicated that her parent–child relationship with the children was not a proper one. The only excuse Mother provided for her acts and omissions was that she was a domestic-violence victim and that the police would not help her because she was married to Father. While Mother may have been a victim, she did not file for divorce until after the children were removed from her care—for the second time—and she continued to visit Father in jail after the divorce was final. She also claimed to have obtained a protective order against Father, but that is not supported by any evidence in the record. The trial court did not have to believe Mother's excuses.

Viewing the evidence in the light most favorable to the trial court's best-interest finding, and giving due deference to that finding, we hold that a reasonable factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Mother and the children was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. We overrule Mother's challenge to the trial court's best-interest finding.

## III. Conclusion

Having overruled Mother's dispositive issues, we affirm the trial court's order terminating her parental rights to the children.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: January 11, 2024